JAMES L. COBB, Plaintiff v. PENNSYLVANIA LIFE INSURANCE COMPANY,
UNIVERSAL AMERICAN CORPORATION, UNIVERSAL AMERICAN CORP.,
UNIVERSAL AMERICAN FINANCIAL CORP., TAMARIND CORPORATION, AND
AMANDA CARLSON, Defendants

No. COA11-117

(Filed 6 September 2011)

**1. Negligence—insurance policy—no duty to explain defini-
tion beyond text of policy—no implied duty to advise—
summary judgment proper**

The trial court did not err in a negligence case based on an insur-
ance policy by granting summary judgment in favor of defend-
ant insurance salesperson. Plaintiff failed to demonstrate that
defendant had a duty to explain the definition of "total disability"
beyond providing the definition in the text of the insurance pol-
icy and plaintiff failed to show an implied duty to advise.

**2. Fraud—negligent misrepresentation—insurance policy—
no justifiable reliance—summary judgment proper**

The trial court did not err in a negligent misrepresentation
case based on an insurance policy by granting summary judgment
in favor of defendant insurance salesperson. Plaintiff could not
establish that he justifiably relied on any misrepresentations by
defendant because the terms of the policy were unambiguously
expressed in the policy, which plaintiff had a duty to read.

**3. Fraud—insurance policy—no reasonable reliance—sum-
mary judgment proper**

The trial court did not err in a fraud case based on an insur-
ance policy by granting summary judgment in favor of defendant
insurance salesperson. Plaintiff could not claim that he reason-
ably relied on defendant's representation of the disability cover-
age in the policy when he could have discovered its true meaning
with minimal investigation.

**4. Fraud—constructive fraud—insurance policy—no relation
of trust and confidence—summary judgment proper**

The trial court did not err in a constructive fraud case based
on an insurance policy by granting summary judgment in favor of
defendant insurance salesperson. There were no facts or circum-
stances which created a relation of trust and confidence.

COBB v. PA. LIFE INS. CO.

[215 N.C. App. 268 (2011)]

**5. Unfair Trade Practices—insurance policy—no violation—summary judgment proper**

The trial court did not err in an unfair and deceptive trade practices case based on an insurance policy by granting summary judgment in favor of defendants. The evidence did not support plaintiff's claim that defendant insurance company employed tactics to delay the investigation or the payment of claims and plaintiff could not claim that defendant refused to make payments without conducting a reasonable investigation based upon all the available information. Furthermore, a violation of N.C.G.S. § 58-3-115, the anti-twisting statute, does not bestow liability upon an insurance company for a private action.

**6. Contracts—insurance policy—reformation—no special circumstances**

Defendant's argument in a breach of contract case based on an insurance policy that he was entitled to contract reformation was meritless. There were no special circumstances that justified his failure to read his policy, and his failure to read his policy barred him from contract reformation.

**7. Insurance—coverage under policy—no genuine issue of fact—summary judgment proper**

The trial court did not err in a case involving an insurance contract by granting summary judgment in favor of defendants. There were no genuine issues of fact as to whether plaintiff should have been covered under the terms of the policy as written.

Appeal by Plaintiff from summary judgment entered 18 August 2010 by Judge Paul C. Ridgeway in Wake County. Heard in the Court of Appeals 8 June 2011.

*Hemmings & Stevens, PLLC, by Aaron C. Hemmings, for Plaintiff-appellant.*

*Alston & Bird, LLP, by Matthew P. McGuire and Anitra Goodman Royster, for Defendants-appellee.*

HUNTER, JR., Robert N., Judge.

James L. Cobb ("Cobb" or "Plaintiff") argues the trial court erred by granting summary judgment to Defendants on Plaintiff's claims of negligence, negligent misrepresentation, fraud, constructive fraud, and unfair and deceptive trade practices. Plaintiff also argues there

are genuine issues of fact regarding Plaintiff's request for reformation, whether Plaintiff's injuries would be covered under the policy if reformed, and whether Plaintiff's injuries are covered by the policy as written. We affirm.

## I. Factual and Procedural History

Plaintiff is a landscaper who was the sole owner of An Outdoor Look, Inc. Since 1996, Cobb's business has been the primary source of income for his family. The Cobb family consists of two children with special needs, who have required multiple surgeries and constant care, and Cobb's wife, Denise Cobb, who is unable to work because she suffers adverse side effects from epilepsy medication.

Defendant Amanda Carlson ("Carlson") is an insurance sales person for Pennsylvania Life Insurance Company ("Penn Life"). Carlson marketed disability policies providing a maximum annual payout of $60,000 to blue-collar workers.

In January 2002, Carlson approached Cobb at a jobsite and made a sales pitch for a Penn Life disability insurance policy. Carlson read the details of their disability policy to Cobb from a Penn Life policy presentation book. After their initial meeting at the jobsite, Carlson met with Cobb at Cobb's home on 24 January 2002, where he completed an application for a Penn Life disability insurance policy. Cobb was issued a temporary disability policy that provided him with insurance coverage until his permanent policy was underwritten.

On 12 March 2002, Carlson delivered the permanent Penn Life disability policy (the "Policy"). The Policy stated in bold capital letters that the policyholder had a thirty-day right to examine the policy before signing it, and could reject it with a full refund if unsatisfied. The Policy informed the policyholder of "YOUR THIRTY-DAY RIGHT TO EXAMINE YOUR POLICY" and advised, "PLEASE READ YOUR POLICY CAREFULLY." The Policy had a monthly premium of $103.78 and a monthly payout of $2,500 if the policyholder became "totally disabled." On the first page of section two of the Policy was a list of definitions of terms used in the Policy. The Policy defined "Totally Disabled" as "mean[ing] that you or your [c]overed [s]pouse are unable to engage in any employment or occupation for which you or your [c]overed [s]pouse are or become qualified by reason of education, training or experience." The temporary policy did not include a definition of "Total Disability." Thus, the first time Cobb could have read this definition was on delivery of the Policy on 12 March 2002.

Prior to purchasing the Penn Life policy, Cobb had purchased a disability income policy and a mortgage disability policy from State Farm Insurance on 3 June 1996. These State Farm policies were "own occupation policies," providing disability income and mortgage income if the policyholder could not perform the occupation he held when he was rendered disabled. Cobb's Penn Life policy contained a ratification endorsement clause requiring Cobb to cancel his State Farm insurance in order to obtain coverage from Penn Life, which he did.

Cobb did not see Carlson again after the 12 March 2002 meeting in which the Policy was delivered and accepted. Cobb did not change the Policy in the three years between the date he signed it and the date of his first claim for benefits. Nor did Cobb call Penn Life to ask questions about the policy prior to filing his first claim.

On 8 April 2005, Cobb was in an automobile accident in Wake Forest, N.C. Cobb complained to an emergency room physician of neck pain, left shoulder pain, and pain on the left side of his chest. On 19 April 2005, Cobb was evaluated by Dr. G. Hadley Callaway at the Raleigh Orthopedic Clinic claiming that "he [was] unable to do lifting or driving," that it "hurt[] to do any repetitive or overhead activities, and that he was "unable to do his current job, which is landscaping." On 30 April 2005, Cobb filed his first claim with Penn Life, explaining his accident and the nature of his injuries and including a physician's report. On 20 May 2005, Cobb was diagnosed with rotator cuff ten- dinitis. After the claim and physician's report were filed, Penn Life investigated the claim and began making payments on 8 June 2005.

On 22 August 2005, Cobb underwent arthroscopic surgery on his left shoulder, which was undertaken because more conservative therapies were ineffective and Cobb wished to regain a full and active lifestyle. On 30 December 2005, Dr. Callaway reported that Cobb had reached "maximum medical improvement with regard to the left shoulder," rated Cobb to have "10% permanent partial impairment of the upper left extremity," and released Cobb from treatment.

On 20 January 2006, Penn Life informed Cobb that his policy covered total disability, not partial disability, and, as a result of the latest report indicating only 10% permanent partial disability, Penn Life was discontinuing his payments after 30 December 2005. Cobb received total disability benefits from April through December 2005 for the injury to his left arm.

On 24 January 2006, Cobb saw Dr. Joel Krakauer of the Raleigh Orthopedic Clinic with complaints of numbness in two fingers of his

left hand and was diagnosed with Cubital and Carpal Tunnel Syndromes. Consequently, on 6 February 2006, Cobb underwent surgery on his left arm and filed another claim for total disability benefits along with an attending physician's report that stated that Cobb would be disabled for four to six weeks after surgery. Penn Life accepted Cobb's claim and began to pay total disability benefits in February 2006. On 1 March 2006, Cobb was again diagnosed with Cubital and Carpal Tunnel Syndromes, this time in his right arm, and on 1 June 2006 underwent another carpal tunnel release surgery. After Cobb's second surgery, Dr. Krakauer estimated in his attending physician's report that Cobb would not be able to return to work until 31 July 2006. However, Dr. Krakauer amended his report a number of times, finally concluding that by 25 September 2006, Cobb was capable of doing only "supervisory" or "light duty" work without heavy use of either arm; it was undetermined when he would be able to return to work as a landscaper. Cobb was paid total disability benefits for the second and third claims and the surgeries for Cubital and Carpal Tunnel Syndromes in both arms from February 2006 to 6 September 2007.

During the period of permanent disability payments in August 2007, Penn Life requested Cobb undergo a Functional Capacity Evaluation to determine his capability to return to work. The report concluded that Cobb was functionally capable of work in the "medium" category, which is defined as the ability to have a "maximum occasional lift of 20 to 50 pounds, a frequent lift of ten to 20 pounds," and capability of "at least frequent sitting and at least frequent standing and/or walking." As a result, Penn Life terminated Cobb's benefit payments for total disability on 6 September 2007.

After Cobb's accident and during the course of his medical treatment, Cobb continued to operate his business, An Outdoor Look, Inc. However, due to his injuries he had to dissolve the company in 2007. Cobb also worked for a period of time in a restaurant he and his wife started, and he installed decks for a third company. Cobb testified, in his deposition, that he was attempting to start a new business selling trees.

On 13 April 2009, Cobb filed a complaint against Carlson and Penn Life (collectively "Defendants"). Cobb alleged negligence, negligent misrepresentation, fraud, and constructive fraud against Carlson for her description of the Penn Life disability insurance policy. Cobb alleged breach of contract, unfair and deceptive trade practices, and unfair claims settlement practices against Penn Life, in addition to claims of vicarious liability for the underlying acts of Carlson. Cobb sought equitable reformation, punitive damages, and special damages.

On 1 June 2010, Defendants filed a motion for summary judgment. Also, Plaintiff filed a motion for partial summary judgment. On 18 August 2010, the trial court granted summary judgment on all claims in favor of Defendants and denied Plaintiff's motion for partial summary judgment. On 10 September 2010, Plaintiff entered his notice of appeal.

## II. Jurisdiction & Standard of Review

This Court has jurisdiction pursuant to N.C. Gen. Stat. § 7A-27(b) (2009). When examining a trial court's grant of summary judgment, we must decide whether "on the basis of materials supplied to the trial court, there was a genuine issue of material fact and whether the moving party [was] entitled to judgment as a matter of law." *Summey v. Barker*, 357 N.C. 492, 496, 586 S.E.2d 247, 249 (2007). This is a question of law subject to *de novo* review. *Wilkins v. Safran*, 185 N.C. App. 668, 672, 649 S.E.2d 658, 661 (2007). " 'If the granting of summary judgment can be sustained on any grounds, it should be affirmed on appeal.' " *Id.* (quoting *Shore v. Brown*, 324 N.C. 427, 428, 378 S.E.2d 778, 779 (1989)). "When considering a motion for summary judgment, the trial judge must view the presented evidence in a light most favorable to the nonmoving party. All inferences of fact must be drawn against the movant and in favor of the nonmovant." *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579, 573 S.E.2d 118, 124 (2002) (quotation marks omitted) (citation omitted).

## III. Analysis

On appeal, Plaintiff argues the trial court erred by granting summary judgment with respect to Plaintiff's claims of (1) negligence, (2) negligent misrepresentation, (3) fraud, (4) constructive fraud, and (5) unfair and deceptive trade practices. Plaintiff further contends the trial court erred in granting Defendants' summary judgment because there were genuine issues of material fact regarding whether Plaintiff was entitled to reformation, whether Plaintiff's injuries would be covered under the policy if reformed, and whether Plaintiff's injuries should be covered under the policy as written.

### A. Negligence

[1] Cobb alleges Carlson represented or implied that if he purchased the Policy and was injured to the degree that he could not perform the duties of his current job as a landscaper, he would receive monthly payments from Penn Life. Instead, the policy Cobb purchased was an "any occupation" policy that would pay benefits only

if he or his spouse were "unable to engage in any employment or occupation" for which he or his spouse were qualified to perform or became qualified to perform with "education, training or experience." (Emphasis added.) Cobb alleges Carlson failed to exercise due care when describing and procuring his disability policy.

Under North Carolina law, "[n]egligence is the failure to exercise proper care in the performance of a legal duty which the defendant owed the plaintiff under the circumstances surrounding them." *Moore v. Moore*, 268 N.C. 110, 112, 150 S.E.2d 75, 77 (1966). It is well established that,

> 'if an insurance agent or broker undertakes to procure for another insurance against a designated risk, the law imposes upon him the duty to use reasonable skill, care and diligence to procure such insurance and holds him liable to the proposed insured for loss proximately caused by his negligent failure to do so.'

*White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 301, 603 S.E.2d 147, 160 (2004) (quoting *Kaperonis v. Underwriters at Lloyd's, London*, 25 N.C. App. 119, 128, 212 S.E.2d 532, 538 (1975)). However, the insurer is not obligated to procure a policy that has not been requested by the proposed insured. *Phillips v. State Farm Mut. Auto. Ins. Co.*, 129 N.C. App. 111, 113, 497 S.E.2d 325, 327 (1998). As such, while an insurer does have the duty to obtain coverage requested by the proposed insured, the agent does not have a duty to advise the individual of other types of insurance coverage for which he is eligible, if that information is not requested. *Pinney v. State Farm Mut. Ins. Co.*, 146 N.C. App. 248, 255, 552 S.E.2d 186, 191 (2001). Furthermore, it is not a duty of the insurer to inquire and inform the policyholder of all aspects of his policy. *Bentley v. N.C. Ins. Guar. Ass'n*, 107 N.C. App. 1, 14, 418 S.E.2d 705, 712 (1992). In the absence of a request, the insurer does not have a legal duty to explain the meaning of every provision in a policy. *Id.*

Here, Carlson procured the insurance policy Cobb applied for and delivered the Policy to him for a 30-day review period. The Policy delivered on 12 March 2002 contained the definitions of terms and listed them at the front of the Policy. Carlson read the presentation book to Cobb that outlined the major terms of the Policy, indicating Cobb would pay a premium of $103.78 a month and would receive $2,500 in benefits if he was totally disabled, and up to $5,000 for a single surgical procedure per accident. Cobb did not ask Carlson, or anyone at Penn Life, questions about the Policy in the time between signing his policy and his accident. Because Carlson did not have a legal

duty to explain and define every term and provision of the Policy unless so asked, and because Carlson did not have a duty to explain the definition of "totally disabled" or the difference between an "any occupation" policy or an "own occupation" policy absent an inquiry by Cobb, Cobb has failed to demonstrate Carlson had a duty to explain the definition of "total disability" beyond providing the definition in the text of the Policy.

In the alternative, Cobb contends Carlson had a duty to advise him of these issues based on their fiduciary relationship. An insurance agent has a limited fiduciary duty to the insured, to wit, the agent must correctly name the insured in the policy and correctly advise the insured of the nature and extent of his coverage under the policy. *Phillips*, 129 N.C. App. at 113, 497 S.E.2d at 327.

An implied duty to advise may only be shown if "(1) the agent received consideration beyond mere payment of the premium; (2) the insured made a clear request for advice; or (3) there is a course of dealings over an extended period of time which would put an objectively reasonable insurance agent on notice that his advice [was] being sought and relied on." *Bigger v. Vista Sales & Mktg, Inc.*, 131 N.C. App. 101, 104, 505 S.E.2d 891, 893 (1998). Here, considering the evidence in the light most favorable to Cobb, there is no evidence Carlson or Penn Life received additional consideration beyond the payment of the premium. Cobb does not allege that he made a request of advice, and Carlson does not recall Cobb asking questions about his policy. Furthermore, there is nothing in Cobb's and Carlson's course of dealings that would put an objectively reasonable insurance agent on notice that her advice was sought or being relied upon. Carlson did not have prior dealings with Cobb before she approached him in January 2002. Carlson and Cobb met three times: when she proposed the Policy, when he filled out an application, and when she delivered the Policy to Cobb. After Carlson delivered the Policy to Cobb, they did not have contact with one another until after Cobb's automobile accident. These exchanges do not suggest the existence of an ongoing relationship of trust and confidence by which Carlson should have been aware that Cobb sought and relied upon her advice. Accordingly, Plaintiff has failed to show an implied duty to advise. Absent any duty, there is no possibility of negligence and summary judgment was appropriate.

## B. Negligent Misrepresentation

**[2]** Cobb next contends Defendants negligently misrepresented the Policy. Negligent misrepresentation " 'occurs when a party justifiably

relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care.' " *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 58, 554 S.E.2d 840, 846 (2001) (citation omitted). It is unclear how Carlson represented the Policy's terms to Cobb—specifically, the terms "totally disabled" and "any occupation." However, even when the facts are construed in the light most favorable to Plaintiff, Cobb cannot establish that he justifiably relied on any misrepresentations by Carlson, because the terms of the policy were unambiguously expressed in the Policy, which Cobb had a duty to read. *Baggett v. Summerlin Ins. & Realty, Inc.*, 143 N.C. App. 43, 53, 545 S.E.2d 462, 468 (Tyson, J., dissenting) ("Persons entering contracts of insurance, like other contracts, have a duty to read them and ordinarily are charged with knowledge of their contents."), *rev'd for reasons stated in the dissent*, 354 N.C. 347, 554 S.E.2d 336 (2001). Despite any alleged misrepresentations, "[w]here a party has reasonable opportunity to read the instrument in question, and the language of the instrument is clear, unambiguous and easily understood, failure to read the instrument bars that party from asserting its belief that the policy contained provisions which it does not." *Id.* at 53, 545 S.E.2d at 468-69. Additionally, "when the party relying on the false or misleading representation could have discovered the truth upon inquiry, the complaint must allege that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence." *Hudson-Cole Dev. Corp. v. Beemer*, 132 N.C. App. 341, 346, 511 S.E.2d 309, 313 (1999).

Here, when Carlson delivered the Policy to Plaintiff, she informed him that he had a thirty-day review period during which he could review the Policy with either his lawyer or accountant and call Penn Life to ask any questions he might have. The Policy she delivered on 12 March 2002 stated in bold capital letters that Cobb had a thirty day right to examine his policy before signing it, and could reject it with a full refund if he was unsatisfied. On the first page of second section of the Policy, there was a list of definitions, including the definition of "Totally Disabled." The Policy stated, "Totally Disabled means that you or your Covered Spouse are unable to engage in any employment or occupation for which you or your Covered Spouse are or become qualified by reason of education, training or experience." Despite any claims of alleged negligent misrepresentation, Cobb had a duty to read and make sure he understood the nature of his policy. Rather than being prevented or denied an opportunity to read the policy, he was in fact urged to do so and was given ample time. Cobb cannot claim he was misinformed on certain elements of his coverage when

the terms were clearly expressed in the policy. Accordingly, summary judgment was appropriate on negligent misrepresentation.

## C. Fraud

[3] Cobb next alleges Carlson committed fraud when she sold him the Policy. The essential elements of actionable fraud are: "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with the intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *State Props., L.L.C. v. Ray*, 155 N.C. App. 65, 72, 574 S.E.2d 180, 186 (2002) (citation omitted) (quotation marks omitted) (alteration in original), *disc. rev. denied*, 356 N.C. 694, 577 S.E.2d 889 (2003). Furthermore, any reliance on alleged false representations must be reasonable. *Id.* Reliance is not reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate. *Id.* "Justifiable reliance is an essential element of both fraud and negligent misrepresentation." *Helms v. Holland*, 124 N.C. App. 629, 635, 478 S.E.2d 513, 517 (1996).

As with his claim for negligent misrepresentation, Cobb cannot claim that he reasonably relied on Carlson's representation of the disability coverage when he could have discovered its true meaning with minimal investigation. The terms were defined on the fourth page of the Policy, which Cobb received on 12 March 2002. Assuming *arguendo* Carlson fraudulently represented the terms of the Policy, Cobb's failure to read the Policy would have resulted in unjustifiable reliance. Accordingly, the trial court did not err in granting summary judgment on fraud.

## D. Constructive Fraud

[4] Cobb also alleges constructive fraud based on Carlson's representation of the Policy. To maintain a claim for constructive fraud, Plaintiff has the burden of proving "facts and circumstances '(1) which created [a] relation of trust and confidence, and (2) led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff.' " *Watts v. Cumberland Cty. Hosp. Sys., Inc.*, 317 N.C. 110, 116, 343 S.E.2d 879, 884 (1986) (quoting *Rhodes v. Jones*, 232 N.C. 547, 549, 61 S.E.2d 725, 726 (1950)).

Carlson did not know Cobb prior to approaching him to advertise Penn Life accident disability coverage in January 2002. After their initial meeting, Carlson only met with Cobb two more times: when he filled out his application which she filed for underwriting, and when

she delivered his policy to him. Cobb never met with Carlson after the Policy was delivered. Three meetings that are part of the normal course of dealing between an insurance agent and the insured do not constitute a special relation of "trust and confidence." As a result, Cobb cannot satisfy this element of constructive fraud, and the trial court ruled appropriately, granting summary judgment on constructive fraud.

### E. Unfair and Deceptive Trade Practices

[5] Cobb also alleges Penn Life violated the unfair and deceptive trade practices statute, N.C. Gen. Stat. § 75-1.1. "To prevail on a claim of unfair and deceptive trade practice a plaintiff must show (1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business." *Spartan Leasing Inc. v. Pollard*, 101 N.C. App. 450, 460-61, 400 S.E.2d 476, 482 (1991). An unfair or deceptive trade practice claim against an insurance company can be based on violations of section 58-63-15 of our General Statutes. *See* N.C. Gen. Stat. § 58-63-15 (2009) (defining "unfair methods of competition and unfair and deceptive acts or practices in the business of insurance"). Any violation of section 58-63-15 constitutes a violation of section 75-1.1. *Lee v. Mut. Cmty Sav. Bank*, 136 N.C. App. 808, 811 n.2, 525 S.E.2d 854, 857 n.2 (2000). Furthermore, the remedy for a violation of section 58-63-15 is the filing of a section 75-1.1 claim. *Id.* Whether a given act is unfair or deceptive is a matter of law to be decided by a court. *Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000).

Cobb alleges Penn Life specifically violated section 58-63-15(11)(l), which states "[d]elaying the investigation or payment of claims by requiring an insured claimant, or the physician, [or] either, to submit a preliminary claim report and then requiring the subsequent submission of formal proof-of-loss forms, both of which submissions contain substantially the same information." N.C. Gen. Stat. § 58-63-15(11)(l) (2009). However, in *Douglas v. Pennamco, Inc.*, we stated that "[w]e see nothing unfair in requiring an insured whose injury is of uncertain duration and subject to improvement to show that he is still disabled before paying him further disability benefits." 75 N.C. App. 644, 645, 331 S.E.2d 298, 299 (1985).

The nature of Cobb's injury changed dramatically in the period between April 2005 and September 2007. Cobb initially filed a disability benefits claim for a rotator cuff injury to his left shoulder and received arthroscopic surgery for it on 22 August 2005. On 25 December

2005, Cobb was released from care for that injury with an evaluated "10% permanent partial impairment of the upper left extremity." In February 2006, Cobb filed for disability benefits after surgery for Cubital and Carpal Tunnel Syndromes in his left arm, and his doctor estimated he would recover from that surgery in four to six weeks. Subsequently, Cobb was diagnosed with Cubital and Carpal Tunnel Syndromes in his right arm and had surgery to correct it on 6 June 2006. Following Cobb's second Carpal Tunnel release surgery, his physician changed his estimation of when Cobb would recover on a number of occasions but finally concluded that by 25 September 2006 Cobb would be capable of doing "supervisory" or "light duty" work.

It is evident that the nature of Cobb's injuries and the estimated date on which he would recover from them were in constant flux from April 2005 to September 2007. As a result, it is reasonable that Penn Life requested Cobb file multiple "proof of loss" reports and attending physician's reports in order to determine if Cobb was eligible for disability benefits. Some of the reports may have mirrored each other during the course of Cobb's recovery, but the evolving nature of Cobb's ailments made it necessary for Penn Life to request repeated updates on his condition. Accordingly, the evidence does not support Cobb's claim that Penn Life employed these tactics to "delay[] the investigation or the payment of claims." N.C. Gen. Stat. § 58-63-15(11)(l).

Cobb also claims that Penn Life violated section 58-63-15(11)(d), which states it is unlawful "[to refuse] to pay claims without conducting a reasonable investigation based upon all available information." N.C. Gen. Stat. § 58-63-15(11)(d) (2009). Penn Life paid Cobb disability benefits from April 2005 until December 2005, based upon the attending physician's reports from Dr. Callaway. When Dr. Callaway released Cobb from his care he filed a report to Penn Life stating Cobb had "10% permanent partial disability." Based on this report, Penn Life determined Cobb was not "totally disabled" and canceled his benefits. In February 2006, Cobb filed a new claim for benefits and received payment until September 2007. Cobb's benefits were terminated after he was given a functional capability evaluation by a physical therapist and it was determined he could perform "medium" work duties.

In both instances Cobb's benefits were terminated, Penn Life relied on medical experts to determine Cobb's level of disability and working capability. When Penn Life terminated Cobb's benefits in

December 2005, it was based on the assessment of Cobb's physician, who had all the relevant information pertaining to Cobb's rotator cuff injury and surgery. Subsequently, when Penn Life terminated Cobb's benefits in September 2007, it was based on his physician's assessment and the corroborating assessment of a physical therapist. Accordingly, Cobb cannot claim that Penn Life did not "conduct[] a reasonable investigation based upon all the available information." N.C. Gen. Stat. § 58-63-15(11)(d).

Cobb also alleges Penn Life violated section 58-63-15(11)(n), by "[f]ailing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement." N.C. Gen. Stat. § 58-63-15(11)(n) (2009). Although Cobb listed a violation of section 58-63-15(11) in his initial complaint, he only argued two subsections of 58-63-15(11) in his motion for summary judgment, 58-63-15(11)(l) and (d). His argument on section 58-63-15(11)(n) was not presented to the trial court, and Cobb is barred from raising a new theory on appeal to defeat summary judgment. *Hoisington v. ZT-Winston-Salem Assoc.*, 133 N.C. App. 485, 490, 516 S.E.2d 176, 180 (1999). Therefore, we do not review Cobb's argument as to section 58-63-15(11)(n).

Cobb alleges Penn Life violated section 58-63-15(1), which prohibits misrepresentations and false advertising of insurance policies. N.C. Gen. Stat. § 58-63-15(1). However, Cobb did not include this claim in his Second Amended Complaint, the only complaint in the record before us. This Court may only consider claims alleged in the pleadings. *Davis v. Durham Mental Health/Dev. Disabilities Area Auth.*, 165 N.C. App. 100, 104, 598 S.E.2d 237, 240 (2004). We therefore do not review this issue.

Cobb also alleges Penn Life violated section 58-3-115, the anti-twisting statute, by inducing Cobb to cancel his existing policies with State Farm Insurance after making incomplete or false comparisons of the State Farm and Penn Life policies. The anti-twisting statute states, in part:

> No insurer shall make or issue, or cause to be issued, any written or oral statement that willfully misrepresents or willfully makes an incomplete comparison as to the terms, conditions, or benefits contained in any policy of insurance for the purpose of inducing or attempting to induce a policyholder in any way to terminate or surrender, exchange, or convert any insurance policy. Any person

who violates this section is subject to provisions of G.S. 58-2-70 or G.S. 58-3-100.

N.C. Gen. Stat. § 58-3-115 (2009).

Generally, a statute "allows for a private cause of action only where the legislature has expressly provided a private cause of action within the statute." *Lea v. Grier*, 156 N.C. App. 503, 508, 577 S.E.2d 411, 415 (2003) (quoting *Vanasek v. Duke Power Co.*, 132 N.C. App. 335, 339, 511 S.E.2d 41, 44 (1999). As established by sections 58-2-70 and 58-3-100, a violation of the anti-twisting statute does not bestow liability upon an insurance company for a private action. Instead, the company may be subject to sanctions from the Commissioner of Insurance. *See* N.C. Gen. Stat. § 58-2-70 (2009) (granting the Commissioner the power to suspend or revoke the license of any person found to be in violation of Chapter 58 of our General Statutes if that person is subject to licensure or certification under the Chapter, or require the payment of a civil penalty or restitution to the person harmed) and N.C. Gen. Stat. § 58-3-100 (2009) (granting the Commissioner the power to revoke, suspend, or restrict the license of any insurer for violation of any law). Cobb does not have a private action based upon section 58-3-115.

## F. Contract Reformation

[6] Cobb claims he is entitled to contract reformation. It is well settled that insurance policies can be reformed for mutual mistake, inadvertence, or the mistake of one induced by the fraud or inequitable conduct of another. *Williams v. Greensboro Fire Ins. Co.*, 209 N.C. 765, 769, 185 S.E. 21, 23 (1936). We have also held that, "if no trick or device has prevented a person from reading a paper which he has signed or accepts as the contract prepared by the other party, then the failure to read the paper when he had an opportunity to do so bars any right to reformation." *Richardson v. Webb*, 119 N.C. App. 782, 785, 460 S.E.2d 343, 345 (1995).

In support of his argument, Cobb cites *Davis v. Davis*, 256 N.C. 468, 472, 124 S.E.2d 130, 133 (1962), which states, "To escape the consequences of a failure to read because of special circumstances, complainant must have acted with reasonable prudence." In *Davis*, the plaintiff, who was 83 years old, had poor vision, and no more than a sixth grade education, claimed that she acted reasonably in relying upon an insurance agent's representations of the contents of a document. *Id.* at 469-70, 124 S.E.2d at 131-32. Our Supreme Court overturned a judgment ruling against the plaintiff and granted a new trial,

in part, to determine if the plaintiff's reliance was reasonable. *Id.* at 473, 124 S.E.2d at 134.

In the present case, Cobb has a high school diploma and attended one year of community college. Cobb, in the course of owning his own business, has conducted many transactions that have required a level of reading comprehension commensurate with the insurance policy at issue. As we have discussed above, Cobb was delivered the Policy in which all the terms of the Policy were unambiguously and conspicuously defined. He was encouraged to read the Policy carefully and had a 30-day period in which to do so. Cobb has alleged no trick or device that prevented him from reading the Policy. As there were no special circumstances that justified Cobb's failure to read his policy, Cobb's failure to read his policy bars him from contract reformation.

### G. Coverage Under Policy

[7] Lastly, Cobb alleges there are genuine issues of material fact as to whether he should be covered under the terms of the Policy as written. Cobb argues that he fits within the Policy's current definition of total disability because his limited education and work experience only qualifies him for landscaping or occupations involving heavy manual labor. Cobb purchased an "any occupation" insurance policy that clearly defined the term "totally disabled." Cobb's physician and a physical therapist determined Cobb is capable of performing "light" to "medium" work and thus he was not unable to work in "any occupation." Not only has Cobb been evaluated as being capable of some types of work, he has, in fact, worked in multiple capacities since his accident, including supervising for his landscaping company, starting and working in a restaurant, and building decks for another company. Also, at the time of his deposition, Cobb was considering starting a new venture selling trees. Cobb is not totally disabled according to the terms of his policy, and he is therefore not entitled to coverage.

### IV. Conclusion

For the reasons stated above, we hold the trial court did not err in ordering summary judgment in favor of Defendants. We affirm the trial court's Order granting summary judgment in favor of Defendants.

Affirmed.

Judges HUNTER, Robert C., and STROUD concur.