IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA22-1049

Filed 20 June 2023

Wake County, No. 19CVS13093

SOUTHLAND NATIONAL INSURANCE CORPORATION in Rehabilitation, BANKERS LIFE INSURANCE COMPANY in Rehabilitation, COLORADO BANKERS LIFE INSURANCE COMPANY, in Rehabilitation, and SOUTHLAND NATIONAL REINSURANCE CORPORATION, in Rehabilitation, Plaintiffs,

v.

GREG E. LINDBERG, GLOBAL GROWTH HOLDINGS, INC. f/k/a ACADEMY ASSOCIATION, INC., EDWARDS MILL ASSET MANAGEMENT, LLC, NEW ENGLAND CAPITAL, LLC, AND PRIVATE BANKERS LIFE AND ANNUITY CO., LTD., Defendants.

Appeal by defendants and cross-appeal by plaintiffs from order and judgment entered 18 May 2022 by Judge A. Graham Shirley II in Wake County Superior Court. Heard in the Court of Appeals 26 April 2023.

*Fox Rothschild by Matthew Nis Leerberg, Troy D. Shelton, Nathan W. Wilson for petitioner-appellants, cross-appellees.*

*Condon Tobin Sladek Thorton PLLC by Aaron Z. Tobin for petitioner-appellants, cross-appellees.*

*Williams Mullen by Wes J. Camden, Caitlin M. Poe, Lauren E. Fussell for respondent-appellees, cross-appellants.*

FLOOD, Judge.

## I. Facts and Procedural Background

Southland National Insurance Corporation, Bankers Life Insurance Company, Colorado Bankers Life Insurance Company, and Southland National Reinsurance Corporation (collectively "Plaintiffs") are insolvent insurers who were purchased by Greg. E. Lindberg ("Lindberg") in 2014. Lindberg, along with Global Growth Holdings, Inc., formerly known as Academy Association, Inc.; Edwards Mill Asset Management, LLC; New England Capital, LLC; and Private Bankers Life and Annuity Co., Ltd. (collectively, "Defendants"), appeal from the trial court's order that held Defendants liable for breach of contract and fraud. Plaintiffs cross-appeal on the narrow issue of whether the trial court erred in failing to award them compensatory and punitive damages in addition to specific performance. The facts that underlie the case are as follows.

*The Plan*

In 2014, Lindberg re-domesticated Plaintiffs to North Carolina in order to take advantage of this State's favorable regulations. Prior to this re-domestication, acting as owner of Plaintiffs, Lindberg made a special agreement with former Commissioner of Insurance, Wayne Goodwin, allowing Lindberg to invest up to forty percent of Plaintiffs' assets into affiliated business entities. Lindberg then invested up to forty percent of Plaintiffs' money into the purchase of other, non-insurance companies, also owned by Lindberg. Simply put, Lindberg created a scheme in which he caused $1.2 billon held for Plaintiffs' policyholders to be invested into other non-insurance companies that he also owned or controlled.

In November 2016, Wayne Goodwin lost his seat as Commissioner of Insurance to Mike Causey (the "Commissioner"), who reduced the cap on affiliated investments from forty percent to ten percent. Lindberg struggled to untangle his affiliated investments and, as the deadline for diversification drew near, the North Carolina Department of Insurance (the "NCDOI") grew concerned that there would be a "mismatch between investments and policyholder liabilities." In other words, because Lindberg had invested so much of Plaintiffs' money into affiliated companies, the NCDOI worried that Plaintiffs might experience a shortfall on their obligation to pay individual policyholders.

Upon realizing an impending shortfall, on 18 October 2018, the Commissioner, Plaintiffs, and Lindberg entered into a Consent Order placing Plaintiffs under administrative supervision. The NCDOI placed an out-of-state company, Noble Consulting Services ("Noble"), in charge of the administrative supervision with Noble's CEO and owner, Mike Dinius ("Dinius") as the main point of contact. During the period of Administrative Supervision, Defendants agreed to deadlines by which they were required to reduce their affiliated investments. Dinius conducted an analysis and concluded it would be virtually impossible for those deadlines to be met. In an effort to avoid the shortfall, in May 2019 Plaintiffs agreed to negotiate a restructuring of the affiliated business entities' obligations. The negotiations around restructuring resulted in a Memorandum of Understanding (the "MOU"), the enforceability of which is central to this case.

While negotiating the terms of the MOU, Defendants maintained total access and control over the portfolios of their affiliated companies—which, by the terms of the MOU were called Specified Affiliated Companies ("SACs"). During this time, Plaintiffs had no equity interest, control, or visibility into the SACs or several tiers of holding companies above them, though they could have asked for that information at any time. Plaintiffs opted to rely on the representations and warranties provided by Defendants. Dinius and members of Plaintiffs' management team were aware that some of the SACs had obligations to third parties, but trusted Defendants' representations and warranties regarding their ability to uphold the terms of the MOU, regardless of those obligations. When asked at trial if during the course of negotiating the MOU, Defendants ever said "[h]ey, Mr. Dinius, look, you know, we're not sure everything in here is right so don't hold us to it," Dinius replied "[n]o, they did not." Dinius further stated that the representations and warranties made in the MOU were "very important[,]" and "[s]ince Lindberg controlled all of these entities, we were relying on him to tell us if he could effectuate this or not."

On 27 June 2019, the parties entered into several agreements—the MOU, an Interim Amendment to Loan Agreement ("IALA"), and a Revolving Credit Agreement (the "Revolver"). The IALA provided debt relief to Defendants of more than $100 million by deferring interest payments for a period of six months and modifying the underlying loans' interest rates and maturity dates, effectively allowing Defendants more time to repay the loans. Meanwhile, under the terms of the Revolver, Plaintiff

Colorado Bankers Life Insurance Company provided a $40 million revolving line of credit to a company owned by Defendants.

## *The MOU*

The MOU, in essence, was an agreement to adjust and restructure debts to facilitate repayment, requiring Lindberg to relinquish control of the SACs by making them subsidiaries of a New Holding Company (the "NHC"). The NHC would be managed by an independent board of qualified individuals whose primary goal would be protecting the best interests of Plaintiffs' policyholders.

Of multiple opening recitals in the MOU, one states the parties . . .

> intend that this MOU and the transactions contemplated herein will serve to protect the best interests of the policyholders of each of the North Carolina Insurance Companies . . . [.] In so doing, the Parties also intend to increase the long-term equity value of the [SACs], so long as it is consistent with the protection of the best interest of the Policyholders and in accordance with North Carolina law.

After the recitals, the MOU enumerated four Articles. Article I bound the parties to execute and deliver the Interim Loan Amendments attached to the MOU, a document that granted debt relief to Defendants. Article II titled "Global Restructuring" sought to restructure most of the revenue-generating businesses within Lindberg's portfolio of companies that owed money to Plaintiffs. Under Article II, the NHC would use the revenue from these companies in Lindberg's portfolio to pay down the debts owed to Plaintiffs. Importantly, Article II also required the

parties to restructure the SACs "to become subsidiaries, either directly or indirectly," of the NHC "on or before [30 September 2019]." Article III titled "Global Loan Amendments" allowed the NHC to make additional, future amendments to the loans on which the SACs were the ultimate borrowers, ensuring that any new loans entered into had protections and benefits for Lindberg. The MOU did not require that Article II and Article III be implemented contemporaneously.

Finally, Article IV titled "Additional Terms and Conditions" contained representations and warranties that:

> a.      Each of the Recitals, Schedules, and Exhibits to this MOU are true and accurate in all respects;
> . . .
>
> e.      The execution of the MOU and the consummation of the transaction set forth in the MOU do not violate any law;
> . . .
>
> g.      The execution of the MOU and the consummation of the transactions set forth in the MOU do not result in a breach of, constitute a default under, or result in the acceleration of any contract to which any of them is a party or is bound or to which any of their assets are subject[.]
>
> h.      The execution of the MOU and the consummation of the transactions set forth in the MOU do not create in any party the right to accelerate, terminate, modify, cancel, or require any notice or consent under any contract to which any of them is a party or is bound or to which any of their assets are subject[.]

Additionally, Article IV contained two important clauses: a severability clause and a specific performance clause. The severability clause stated that "[a]ny term or

provision of this MOU that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof . . . [.]" Under the specific performance clause, the parties agreed that a nonbreaching party "shall be entitled to specific performance . . . in addition to any other remedy to which they are entitled at law or in equity."

On the same day the parties entered into the MOU, IALA, and Revolver, Plaintiffs consented to being placed into Rehabilitation pursuant to N.C. Gen. Stat. § 58-30-75. During Rehabilitation, a moratorium was placed on policyholder surrenders, and Plaintiffs' obligation to pay policyholders was suspended. During the period of Rehabilitation and upon execution of the MOU, Defendants had either direct or indirect control over most of the SACs and the authority to contribute those entities to the NHC.

*The Breach*

Two weeks before the deadline to perform under Article II of the MOU, George Vandeman ("Vandeman") acting as a chairman for Defendant Academy Association, Inc., sent a communication to Plaintiffs stating that the restructuring plan set forth under Article II could not be accomplished because:

> i. Seller notes . . . are subject to breach and acceleration upon reorganization;
>
> ii. The debt reduction from the IALA and the reorganization may result in adverse tax consequences to Lindberg; [and]

iii. The reorganization will trigger certain changes in control provisions in contracts with third-parties[.]

On 30 September 2019, Defendants failed to contribute the SACs to the NHC, thus breaching Article II of the MOU. On 1 October 2019, Plaintiffs filed suit in Wake County Superior Court alleging breach of the MOU and fraud. Plaintiffs requested specific performance of the MOU, compensatory damages, and punitive damages.

*The Trial Court's Order and Judgment*

After a bench trial, the trial court entered a judgment in favor of Plaintiffs, ordering specific performance but not compensatory or punitive damages. First, the trial court held that Article III of the MOU was unenforceable because it was an agreement to agree, making it severable from the rest of the MOU. Upholding the remainder of the MOU, the trial court found Defendants breached Article II by failing to perform by the 30 September 2022 deadline, and awarded specific performance.

Next, the trial court concluded that Defendants fraudulently induced Plaintiffs to sign the MOU by making false representations and warranties under Article IV regarding the execution and performance of obligations. Specifically, the trial court found that Defendants fraudulently represented that performance under the MOU was duly authorized and

> (2) [did] not violate any law; (3) would not result in a breach of, constitute a default under, or result in the acceleration of any contract to which any of them is a party or is bound or to which any of their assets are subject; and (4) [did] not create in any party the right to accelerate, terminate, modify, cancel or require any notice or consent under any

> contract to which any of them is a party or is bound or to which any of their assets are subject.

The trial court further found that the fraudulent representations and warranties made to Plaintiffs in the MOU caused Plaintiffs to enter into two other agreements—the IALA and the Revolver—to their detriment. The trial court declined to award any remedy for Plaintiffs' fraud claim because they had elected the remedy of specific performance. Instead, the trial court stated that "if an appellate Court should determine that specific performance is not an available remedy this Court would enter an award of punitive damages in the amount of three times compensatory damages."

On 26 May 2022, the trial court entered an Amended Judgment and Order to correct clerical errors. Defendants filed a Notice of Appeal of the Amended Judgment and Order on 13 June 2022. Plaintiffs then filed a Conditional Notice of Cross-Appeal, seeking review of the trial court's failure to award fraud damages. As part of their Cross-Appeal, Plaintiffs also filed a request for Judicial Notice on 19 January 2023, which this Court denied by order.

## II. **Jurisdiction**

An appeal lies of right directly to this Court from any final judgment of a superior court. N.C. Gen. Stat. § 7A-27(b)(1) (2021).

## III. **Argument**

On appeal, Defendants argue that Article III was an essential part of the MOU and without it, the entire agreement was rendered unenforceable. Further, if the MOU was entirely unenforceable, then the trial court erred when it found fraudulent inducement. For the reasons set forth below, we disagree.

**A. Standard of Review**

"The standard of review on appeal from a judgment entered after a non-jury trial is 'whether there is competent evidence to support the trial court's findings of fact and whether the findings support the conclusions of law and ensuing judgment.'" *Cartin v. Harrison*, 151 N.C. App. 697, 699, 567 S.E.2d 174, 176 (quoting *Sessler v. Marsh*, 144 N.C. App. 623, 628, 551 S.E.2d 160, 163 (2001)), *disc. rev. denied*, 356 N.C. 434, 572 S.E.2d 428 (2002).

**B. Severance of Article III**

Plaintiffs and Defendants agree the trial court correctly concluded Article III was an unenforceable agreement to agree. Defendants, however, contend Article III was essential to the MOU's main purpose, and severing it rendered the entire MOU unenforceable. After a thorough review, we conclude the trial court did not err when it enforced the remainder of the MOU after severing Article III.

1. <u>Main Purpose</u>

Defendants argue Article III was a main purpose and an essential feature of the MOU upon which other provisions depended. We disagree.

To determine whether an unenforceable provision is a "main purpose" or "essential feature," the Court must look at whether other provisions of the contract are dependent on the unenforceable one. *See Robinson, Bradshaw, & Hinson, P.A. v. Smith*, 129 N.C. App. 305, 314, 498 S.E.2d 841, 848 (1998) (holding that despite one section of a contingency-fee contract being invalid, the remainder of the contract is still enforceable because it is severable and not the main purpose or essential feature of the agreement). Put another way, severance of an unenforceable provision is appropriate when the other provisions "are in no way dependent upon the enforcement of the illegal provisions for their validity." *Am. Nat'l Elec. Corp. v Poythress Commer. Contractors, Inc.*, 167 N.C. App. 97, 101, 604 S.E.2d 315, 317 (2004) (citations omitted).

To argue that a contract's main purpose may not be severed, Defendants cite to *Green v. Black*, a case in which the parties entered into a written agreement where the defendant was to repay the plaintiff for a personal loan. *Green v. Black,* 270 N.C. App. 258, 840 S.E.2d 900 (2020). The agreement included a provision stating that, should the defendant default, a new agreement would be drafted that would include a "mutually agreed upon payment schedule for the remaining amount due." *Green*, 270 N.C. App. at 260, 840 S.E.2d at 902. This Court held that the provision was void for uncertainty and was therefore unenforceable, but upheld the remainder of the agreement. *Id.* at 265, 840 S.E.2d at 905–06. This Court further concluded that the parties' intended main purpose was to "memorialize an agreement to exchange money

for a promise to pay the money back with interest on a certain date[,]" and because of that, a sentence regarding what would happen in the event of default was severable. *Id.* at 264, 840 S.E.2d at 905.

Unlike the parties in *Green*, the parties in this case expressly memorialized the MOU's main purpose, leaving nothing for this Court to demystify. At the time of signing, the parties agreed that the MOU's main purpose was "to protect the best interests of the policyholders[,]" and "in so doing, the parties also intend to increase the long-term equity value of the [SACs], *so long as it is consistent with the protection of the best interests of the Policyholders*[.]" (emphasis added).

Defendants attempt to convince this Court that the MOU's main purpose was not only to rehabilitate Plaintiffs' companies, but to ensure Lindberg would continue to benefit from the overall transaction. This argument ignores another of Defendants' motivations: to make money using capital provided by hardworking, North Carolina policyholders.

## 2. Severability

Defendants further argue that because Article III was the main purpose of the MOU, severing it rendered the remainder of the MOU unenforceable. We disagree.

"It is the general law of contracts that the purport of a written instrument is to be gathered from its four corners . . . ." *Ussery v. Branch Banking and Trust Co.*, 368 N.C. 325, 336, 777 S.E.2d 272, 280 (2015) (quoting *Carolina Power & Light Co. v. Bowman*, 229 N.C. 682, 693–94, 51 S.E.2d 191, 199 (1949) (Stacy, C.J. ,

Dissenting)). "'A contract is entire, and not severable, when, by its terms, nature and purpose it contemplates and intends that each and all of its parts, material provisions, and the consideration are common each to the other, and interdependent.'" *Mebane Lumber Co. v. Avery & Bullock Builders, Inc.*, 270 N.C. 337, 341, 154 S.E.2d 665, 668 (1967) (quoting *Wooten v. Walters*, 110 N.C. 251, 254, 14 S.E. 734, 735 (1892)). On the other hand, this Court has held that a contract may be severable when it has two or more parts that are "not necessarily dependent on each other, nor is it intended by the parties that they shall be." *Kornegay v. Aspen Asset Group, LLC*, 204 N.C. App. 213, 226, 693 S.E.2d 723, 734 (2010) (quoting *Mebane Lumber Co.*, 270 N.C. at 342, 154 S.E.2d at 668). A court may sever an unenforceable provision and enforce the balance of the contract only when the other provisions "are in no way dependent upon the enforcement of the illegal provisions for their validity." *Am. Nat'l Elec. Corp.,* 167 N.C. App. at 101, 604 S.E.2d at 317. While not determinative, the decision to include a severability clause in an agreement may provide general guidance when determining the parties' intent. *See Sheffield v. Consolidated Foods Corp.,* 302 N.C. 403, 421-22, 276 S.E.2d 422, 434-35 (1981) ("[A] severability is relevant to a decision only when the validity of a particular provision of the Act is at issue."); *see also* 15 Williston on Contracts § 45:6 (4th ed) ("The parties' intent to enter into a divisible contract may be expressed in the contract directly, through a so-called 'severability clause[.]'").

Defendants argue "[t]he rest of the MOU depended on [Article III,]" and "Article III was the key to maximizing the value of the SACs to pay back Plaintiffs investments." To support this argument, Defendants make several points. First, as evidence of the entangled purpose of Articles II and III, Defendants point to the fact that performance under the two articles was due on the same day, stating that the articles were dependent on each other "because of the nature of insurance rehabilitation." Next, Defendants claim that, standing alone, Article II left Lindberg vulnerable because it allowed the NHC and Plaintiffs to bind themselves (and ultimately Lindberg) to potentially risky financing agreements. Further, without Article III, the SACs would no longer enjoy the protection of a right to cure within thirty days after notice of default. Finally, Article III provided Lindberg a "success fee" of 1.5% of all the debt that was paid down—a significant benefit which, without Article III, Lindberg would no longer be entitled to.

Defendants' evidence of Article III's intrinsic entanglement with the remainder of the MOU is attenuated at best. As the trial court noted in its Amended Judgment and Order, "the other Articles of the MOU can and have been implemented and enforced notwithstanding the failure of the Parties to complete [Article III]." A review of the Record leads us to the same conclusion: Article II and Article III were not necessarily dependent on each other, nor did the parties intend they be. *See Kornegay*, 204 N.C. App. at 213, 693 S.E.2d at 723 (holding a contract was divisible because there were two distinct promises, each of which could be performed without

the other). Importantly, as of the publishing of this opinion, Defendants and Lindberg have enjoyed the benefit of millions of dollars of debt relief provided by Plaintiffs, yet continue to claim the MOU is unenforceable.

Further, despite each Article under the MOU having the common purpose of rehabilitating Plaintiffs, performance of the parties under each Article was separate and distinct. Under Article I, Plaintiffs promised to grant debt relief to Defendants; under Article II Defendants promised to reorganize the SACs under the NHC; finally, under Article III, both parties would amend loan agreements from Plaintiffs to some of the SACs in the future. We further note that the amendments and restructuring outlined in Article III were to take place *after* the SACs were transferred to the NHC. These facts tend to show that each article required independent performance during different times and could involve independent breach. Further, while it may be true that without Article III Lindberg would be left in a financially vulnerable situation, protecting Lindberg was not the primary purpose of the MOU. Rather, the primary purpose was to protect Plaintiffs' policyholders, as concluded above. Finally, taking into consideration all "four corners" of the MOU and the promises contained therein, this Court gleans the parties intended the MOU to be divisible given the inclusion of a severability clause. *See Ussery*, 368 N.C. at 336, 777 S.E.2d at 280. For those reasons, we conclude the trial court did not err when it enforced the remainder of the MOU after severing Article III. *See Kornegay* 204 N.C. App. at 213, 693 S.E.2d at 723.

**C. Fraudulent Inducement**

Next, Defendants appeal from the trial court's finding of fraudulent inducement, arguing that Plaintiffs' reliance on the representations and warranties under Article IV was per se unreasonable because they are sophisticated entities and failed to conduct any due diligence prior to entering into the MOU. We disagree.

To prevail on their claim that the trial court erred when it found Defendants liable for fraudulent inducement, Defendants must show that none of the evidence relied on by the trial court in reaching its conclusion was competent. *Sisk v. Transylvania Cmty. Hosp. Inc.*, 364 N.C. 172, 179, 695 S.E.2d 429, 434 (2010). To determine the competency of the trial court's evidence supporting its conclusion that Defendants fraudulently induced Plaintiffs, we begin by analyzing whether all the elements of fraud are met. We then examine whether Plaintiffs' reliance on Defendants' representations was reasonable.

## 1. Fraud

Defendants assert the trial court erred in finding they fraudulently induced Plaintiffs to enter into the MOU, IALA and Revolver. The elements of fraud are: "(1) false representation or concealment of a past or existing material fact; (2) reasonably calculated to deceive; (3) made with intent to deceive; (4) which does in fact deceive; (5) resulting in damage to the injured party." *Whisnant v. Carolina Farm Credit*, 204 N.C. App. 84, 94, 693 S.E.2d 149, 156–57 (2010) (citation omitted) (cleaned up).

Here, there is no disputing that Plaintiffs were deceived by Defendants, and they suffered economic injury as a result. Therefore, this Court turns its attention to the remaining three elements to determine whether Defendants' conduct amounted to fraud.

With respect to the first three elements, the Record tends to show that Defendants made representations and warranties that were calculated to deceive Plaintiffs regarding their obligations to third parties and ability to perform under the terms of the MOU. Specifically, under Article IV, Defendants represented that

> [t]he execution of the MOU and the consummation of the transactions set forth in the MOU do not create in any party the right to accelerate, terminate, modify, cancel, or require any notice or consent under any contract to which any of them is a party or is bound or to which any of their assets are subject[.]

Two weeks before performance was due, however, Vandeman, acting as a chairman for Defendant Academy Association, Inc., sent an email to Plaintiffs stating that the restructuring plan set forth under Article II could not be accomplished because:

> i. Seller notes . . . are subject to breach and acceleration upon reorganization;
>
> ii. The debt reduction from the IALA and the reorganization may result in adverse tax consequences to Lindberg; [and]
>
> iii. The reorganization will trigger certain changes in control provisions in contracts with third-parties[.]

Put plainly, Defendants made representations about their ability to perform under the MOU, then just two weeks before performance was due, cited those exact representations as the reason why they *could not* perform. Relying on these representations, Plaintiffs entered into the MOU, IALA, and Revolver, which provided Defendants debt relief of more than $100 million and a $40 million revolving line of credit. The facts in the Record show Defendants were in the best position to understand whether they could perform under the MOU's terms because Lindberg controlled the SACs. Further, because Lindberg understood the intricacies of the SACs' business structures, he knew performance under the MOU was impossible, yet made representations that induced Plaintiffs to enter into the contract. For those reasons, we hold the trial court did not err in finding Defendants' actions satisfied the elements of fraud. *See Whisnant,* 204 N.C. App. at 94, 693 S.E.2d at 156–57.

## 2. Reasonable Reliance

Next, we consider whether Plaintiffs' reliance on Defendant's fraudulent representations was reasonable. To prevail on a fraud claim, a plaintiff must prove they actually relied on misrepresentations and that their reliance was reasonable. *Cobb v. Pa. Life Ins. Co.*, 215 N.C. App. 268, 277, 715 S.E.2d 541, 549 (2011). "Reliance is not reasonable if a plaintiff fails to make any independent investigation . . . [.]" *State Props., LLC v. Ray*, 155 N.C. App. 65, 73, 574 S.E.2d 180, 186 (2002). Reliance will not be considered unreasonable, however, "if the plaintiff can show that 'it was induced to forego additional investigation by defendant's misrepresentations.'"

*Hudgins v. Wagoner*, 204 N.C. App. 480, 491, S.E.2d 436, 445 (2010) (citations omitted). Additionally, if a defendant's representations "could not be readily or easily verified," a plaintiff's reliance is more likely to be regarded as reasonable. *Phelps-Dickson Builders L.L.C. v. Amerimann Partners*, 172 N.C. App. 427, 439, 617 S.E.2d 664, 671 (2005). The reasonableness of a party's reliance is an issue of fact for the fact finder. *Marcus Bros. Textiles v. Price Waterhouse, LLP*, 350 N.C. 214, 224, 513 S.E.2d 320, 327 (1999). "Findings of fact made by the trial judge are conclusive on appeal if supported by competent evidence, even if . . . there is evidence to the contrary." *Sisk*, 364 N.C. at 179, 695 S.E.2d at 434 (quoting *Tillman v. Com. Credit Loans, Inc.*, 362 N.C. 93, 100–01, 655 S.E.2d 362, 369 (2008)). Competent evidence is evidence that a "reasonable mind might accept as adequate to support the finding." *City of Asheville v. Aly*, 233 N.C. App. 620, 625, 757 S.E.2d 494, 499 (2014) (citing *In re Adams*, 240 N.C. App. 318, 320-21, 693 S.E.2d 705, 708 (2010)).

Defendants claim that Plaintiffs' reliance was per se unreasonable because Plaintiffs are sophisticated business entities entering into a multi-billion-dollar deal, yet chose to forego conducting any due diligence prior to signing the MOU. Plaintiffs concede they failed to conduct due diligence; however, for the reasons discussed below, we hold their reliance was reasonable under the circumstances.

Defendants cite to several cases involving the sale of real property in which a plaintiff failed to conduct due diligence prior to entering into a contract. There is, however, one important difference between the cases cited and the facts of our current

case: this was not a purchase. The MOU was a temporary agreement to help Plaintiffs out of Rehabilitation and, eventually, back into the ownership and control of Lindberg. The MOU functioned as a stop gap to avoid impending financial ruin, and as such, functioned very differently than would an MOU for a real property transaction. Here, the only thing being bought under the MOU was time.

Further, while it is true Plaintiffs had unfettered access to Defendants' accountings, the facts show that Lindberg was in the best position to understand the complex scaffolding of each SAC's business structure. Collectively, these complex structures involved: multiple tiers of operating and holding companies; loans that had been syndicated and repackaged, then transferred several times; underlying loan agreements and sellers' notes; equity equivalence agreements; and third-party financing agreements. Plaintiffs lacked the time and expertise to determine whether the representations and warranties were accurate, and ascertaining that information would have involved a complex legal analysis. The veracity of Defendants' representations could not have been "readily or easily verified," and moreover, Plaintiffs had no reason to believe Lindberg would make false statements, considering he stood to benefit from the MOU's success as well. *See Phelps-Dickson Builders L.L.C.*, 172 N.C. App. at 439, 617 S.E.2d at 671.

Here, because the MOU did not govern a sale, we do not hold Plaintiffs to the same heightened standard as the sophisticated business entities in the case law to which Defendant cites. Further, Plaintiffs' reliance on Defendants' representations

was reasonable because discovery of Defendants' fraud would not have been readily or easily verified, and Defendant was in the best position to know whether the MOU, as written, could be effectuated. *See id*. at 439, 617 S.E.2d at 671. For those reasons, we hold the trial court relied on competent evidence to reach its conclusion and affirm the fraud judgment against Defendants.

### D. Damages

On cross-appeal, Plaintiffs argue that the trial court erred when it failed to award damages for Defendants' fraud. Conversely, Defendants argue the trial court correctly concluded Plaintiffs were not entitled to compensatory or punitive damages for fraud, reasoning that it would amount to "double recovery," running afoul of the election of remedies doctrine.

After a review of the Record, we agree with Plaintiffs.

#### 1. Standard of Review

"Since this case was tried before a judge sitting without a jury, this Court is bound by the trial court's findings which are supported by competent evidence, even if evidence exists to sustain contrary findings. [R]eview of the trial court's conclusions of law is de novo." *Hickory Orthopaedic Ctr., P.A. v. Nicks*, 179 N.C. App. 281, 286, 633 S.E.2d 831, 834 (2006) (quotation omitted).

#### 2. Election of Remedies Doctrine

"The fact finder . . . has broad discretion in awarding damages to ensure that the plaintiff is made whole and the wrongdoer does not profit from its conduct."

*TradeWinds Airlines, Inc. v. C-S Aviation Servs.*, 222 N.C. App. 834, 850, 733 S.E.2d 162, 174 (2012). The "doctrine of election of remedies is not to prevent recourse to any remedy, but to prevent double redress for a single wrong." *Smith v. Oil Corp.,* 239 N.C. 360, 368, 79 S.E.2d 880, 885 (1954).

Our Supreme Court's precedent demonstrates that remedies for both breach of contract and fraud may coexist. In *Parker v. White*, our Supreme Court held that a party who has been fraudulently induced to enter into a contract may either repudiate the contract or "affirm the contract, keeping whatever property or advantage he has derived under it, and may recover in an action for deceit the damages caused by the fraud." 235 N.C. 680, 688, 71 S.E.2d 122, 128 (1952). Affirming the contract ends the defrauded party's right to rescind the contract, but does not excuse breach of that agreement. *See Hutchins v. Davis,* 230 N.C. 67, 73, 52 S.E.2d 210, 214 (1949) (holding that affirming a contract does not prevent the defrauded party from recovering by filing a new action or counterclaim for damages sustained as a result of fraud).

Here, the doctrine of election of remedies does not bar Plaintiffs from recovering for both specific performance and for monetary damages because each remedy relates to a separate and distinct wrongdoing by Defendants. Defendants breached the MOU on 1 October 2019 when they failed to reorganize the SACs. Defendants' fraudulent conduct, however, occurred on 27 June 2019 when the MOU, IALA, and Revolver were executed.

It is true that Plaintiffs made one election of remedy relating to their breach of contract claim—specific performance. Plaintiffs' election of specific performance, however, does not preclude them from recovering monetary damages for fraud. These harms are not mutually exclusive and neither are their remedies.

### 3. Conditional Judgment

A conditional judgment is "one whose force depends upon the performance or nonperformance of certain acts[.]" *Hagedorn v. Hagedorn*, 210 N.C. 164, 165, 185 S.E. 768, 769 (1936). Put another way, if an order is not self-executing, it is "therefore, conditional and void." *Cassidy v. Cheek*, 308 N.C. 670, 674, 303 S.E.2d 792, 795 (1983).

Here, in its judgment, the trial court found Defendants liable for fraud and stated that "if an appellate Court should determine that specific performance is not an available remedy this Court would enter an award of punitive damages in the amount of three times compensatory damages." The conditional assessment of compensatory damages in the event this Court determined specific performance is not available makes the trial court's judgment "not self-executing." *See id.* at 674, 303 S.E.2d at 795. For that reason, we vacate the trial court's judgment only as it pertains to remedies available to Plaintiffs for Defendants' fraud, and we remand for further proceedings consistent with this opinion.

### IV. **Conclusion**

We hold the trial court's conclusions of law were supported by findings of fact based on competent evidence. *See Cartin,* 151 N.C. App. at 699, 567 S.E.2d at 176. For those reasons, this Court affirms the trial court's conclusions that the MOU was enforceable after severing Article III, and that Defendants are liable for fraud. This Court further vacates and remands the trial court's order and judgment only as it relates to remedies available to Plaintiffs for Defendants' fraud.

AFFIRMED IN PART; VACATED AND REMANDED IN PART.

Judges ZACHARY and WOOD concur.