Dillon v. Stafford, 2020 NCBC 97.

STATE OF NORTH CAROLINA

GUILFORD COUNTY

CAROLYN DILLON and FLIGHT
ATTENDANT CAREER TRAINING,
LLC,

Plaintiffs,

v.

WENDY STAFFORD and TRIAD
AVIATION ACADEMY, LLC,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 3694

**ORDER AND OPINION ON
MOTIONS FOR
SUMMARY JUDGMENT**

1. This case arises from a disagreement between Plaintiff Carolyn Dillon ("Dillon") and Defendant Wendy Stafford ("Stafford") over the terms of a purchase and sale transaction between them. Stafford claims Dillon purchased only Stafford's interest in Plaintiff Flight Attendant Career Training, LLC ("FACT"), a company in which Defendant Triad Aviation Academy, LLC ("TAA") also claims ownership, and Dillon contends she purchased FACT in its entirety. Each party now seeks summary judgment under Rule 56 of the North Carolina Rules of Civil Procedure ("Rule(s)").[1]

2. After considering the Motions, the briefs and related materials submitted in support of and in opposition to the Motions, the arguments of counsel at the hearing on the Motions, and other appropriate matters of record, the Court hereby **GRANTS** the Motions **in part** and **DENIES** the Motions **in part** as set forth below.

---

[1] The specific motions at issue are (i) TAA's Motion for Summary Judgment ("TAA's Motion"), (ECF No. 66); (ii) Dillon and FACT's Motion for Summary Judgment ("Plaintiffs' Motion"), (ECF No. 68); and, (iii) Stafford's Motion for Summary Judgment ("Stafford's Motion"), (ECF No. 71), (collectively, the "Motions").

*Sharpless McClearn Lester Duffy, PA, by Eugene E. Lester and Melanie C. Cormier, for Plaintiffs Carolyn Dillon and Flight Attendant Career Training, LLC.*

*Hoffman Koenig Hering PLLC, by James Hoffman, Daniel W. Koenig, and Deborah M. Mergner, for Defendant Wendy Stafford.*

*Brooks, Pierce, McLendon, Humphrey & Leonard LLP, by Clint S. Morse, for Defendant Triad Aviation Academy, LLC.*

Bledsoe, Chief Judge.

## I.

## FACTUAL BACKGROUND

3.    The Court does not make findings of fact in ruling on motions for summary judgment.  The following background, drawn from the evidence submitted in support of and in opposition to the Motions, is intended only to provide context for the Court's analysis and ruling.

4.    It is undisputed that Stafford created a flight attendant training program while living in Florida called Flight Attendant Express or "FAE."  (Dep. Wendy Stafford 8:6–9:14 [hereinafter "Dep. Stafford"][2]; Ex. 53 Aff. Wendy Stafford ¶¶ 2, 4 [hereinafter "Aff. Stafford"], ECF No. 72.1.[3])  Stafford developed a study manual for her program, which she copyrighted in 2002 and 2005.  (Dep. Stafford 11:2–12:15; Aff. Stafford ¶ 6; Ex. 2 2002, 2005 Copyright Registrations, ECF No. 72.1.)  In 2007 and 2008, Stafford updated the manual and registered a new copyright.  (Aff. Stafford

---

[2] Excerpts from the deposition of Wendy Stafford are located at ECF Nos. 70.1 and 72.1.

[3] Evidence located in ECF No. 72.1 are exhibits to Stafford's brief in support of her Motion, including Stafford's affidavit.  (*See* Def. Wendy Stafford's Br. Supp. Mot. Summ. J., ECF No. 72.)

¶ 8; Ex. 4 2007, 2008 Copyright Registrations, ECF No. 72.1.) In September 2015, FAE was administratively dissolved. (Aff. Stafford ¶ 8; Ex. 5 Div. Corps., ECF No. 72.1.)

5.     Stafford moved to North Carolina in October 2015. (Dep. Stafford 12:16–18; Aff. Stafford ¶ 9.) Once in North Carolina, she called TAA's President Bruce McCall ("McCall"), (Aff. Bruce McCall ¶ 2 [hereinafter "Aff. McCall"], ECF No. 66.6), to discuss "the possibility of starting a flight attendant program . . . [in which Stafford] would lead the way[,]" (Dep. Stafford 15:16–18). Stafford sent TAA a proposal "stating what [she] could bring to the program, [her] history, what [she] would like to be paid, [and] what [they] could charge students for the program[.]" (Dep. Stafford 16:1–5.)

6.     Stafford and TAA reached an oral agreement but did not execute a written contract. (Dep. Stafford 15:19–25; Aff. Stafford ¶ 11.) Under their oral agreement, Stafford agreed to organize and teach the training course, and TAA agreed to provide startup costs, marketing and administrative services, and a classroom. (Dep. Stafford 16:24–17:10; Aff. Stafford ¶ 10.) McCall also developed the name "Flight Attendant Career Training." (Aff. Stafford ¶ 13.) FACT's admission form displayed the logo "Flight Attendant Career Training, Triad Aviation Academy," and the disclaimer each student was required to sign was stated in terms of TAA's liability. (Aff. Stafford ¶ 16; *see* Ex. 10 FACT Forms [hereinafter "FACT Forms"], ECF No. 72.1.) Stafford chose not to make FACT an LLC because "[McCall] owned part of it . . . . [They] were partners." (Dep. Stafford, 18:19–23.)

7. FACT operated at a loss for several months after opening, but the profits made thereafter were split between TAA and Stafford. (Aff. Stafford ¶ 14.) Stafford and TAA operated FACT in Greensboro, North Carolina, (*see* Aff. Carolyn Dillon ¶ 26 [hereinafter "Aff. Dillon"], ECF No. 86), and "jointly" contracted with third-party vendors for goods and services, including David Bame ("Bame"), who acted as Admissions Coordinator/Instructor for FACT, (Aff. Stafford ¶ 12). In 2016, Stafford caused FACT to hire Dillon, a former flight attendant, as a FACT instructor. (Dep. Stafford 21:5–22:11; Aff. Dillon ¶ 2.)

8. Stafford again updated the copyright for her manual in May 2018. (Aff. Stafford ¶ 15; Ex. 9 2018 Copyright Registration [hereinafter "2018 Copyright Registration"], ECF No. 72.1.)

A. The Agreement Between Stafford and Dillon

9. Due to health concerns that began in 2017, Stafford decided in 2018 that "[she] needed to sell [her] share of FACT as soon as possible." (Aff. Stafford ¶ 17.) Stafford approached McCall to inquire whether TAA would purchase FACT, but he declined her offer. (Aff. Dillon ¶ 4.) Stafford then approached Dillon, who expressed interest. (Aff. Stafford ¶ 18; Aff. Dillon ¶ 5.) Stafford first offered to sell "her business" to Dillon for $300,000, which Dillon declined. (Aff. Dillon ¶ 5.) Stafford then offered to sell "the FACT program" for $45,000, which Dillon again declined. (Aff. Dillon ¶ 6.)

10. Dillon signed a Non-Disclosure Agreement dated May 21, 2018 stating that she was interested in "pursuing discussions concerning the potential investment in

the [FACT] program portion of [TAA]." (Ex. 12 Non-Disclosure Agreement [hereinafter "Non-Disclosure Agreement"], ECF No. 72.1.) McCall sent Dillon a "FACT Framework Document" on June 17, 2018 as a "first cut at a framework document that [would] hopefully move the dialog along with [Stafford]." (Ex. 16 FACT Framework Emails [hereinafter "FACT Framework Emails"], ECF No. 72.1.) On June 20, 2018, Dillon responded that she was "not interested in buying [Stafford's] LLC, only her teaching materials" and noted that Stafford "finally admitted to [Dillon] that she [did] not own the company outright." (FACT Framework Emails.) On or about June 20, 2018, Stafford and Dillon agreed on a purchase price of $10,000. (Aff. Dillon ¶ 7.)

11. On June 21, 2018, Dillon forwarded the FACT Framework Document to Stafford and said she "would like to purchase [Stafford's] portion of FACT." (Ex. 15 June 21 Emails, ECF No. 72.1.) On June 26, Dillon emailed Stafford to ask "what[ ] exactly [were her] interests in FACT" and stated that she "would like [the document] changed that [Stafford] convey [her] interests to [Dillon]. Take out TAA because [it] is not buying [Stafford's] half of the business." (Ex. 17 June 26 Email [hereinafter June 26 Email], ECF No. 72.1.)

12. Stafford insists that she was clear that she did not own all of FACT and "[a]t no time did [she] ever tell Dillon that [she] owned all of FACT." (Aff. Stafford ¶ 18.) For her part, Dillon claims that she asked Stafford about TAA's or McCall's ownership interest in FACT several times during their negotiations and that Stafford replied that she owned the manual and copyright to the manual and had the authority to sell

the manual and other assets.  (Aff. Dillon ¶ 10.)  Dillon further avers that Stafford told Dillon that there was nothing in writing regarding the relationship between Stafford and TAA, that Dillon would not be bound to work with TAA, and that she had never signed anything to transfer ownership of FACT to TAA or McCall.  (Aff. Dillon ¶¶ 10–11.)  Based on these conversations, Dillon asserts that she was "confident" that Stafford owned all of FACT and that she and TAA had only agreed to "split the income stream[.]"  (Aff. Dillon ¶ 11.)

13.  Stafford and Dillon signed the FACT Framework Document on June 29, 2018 and July 2, 2018, respectively, stating that "[TAA] and [Dillon] desire to take over [FACT] entirely[,]" that Stafford was to receive "a total of $10,000 for her interest in FACT[,]" and that Stafford would "convey all of her interests in FACT (intellectual rights and ongoing business income stream) to Dillon effective August 1, 2018."  (Ex. 13 FACT Framework Doc. [hereinafter "FACT Framework Doc."], ECF No. 72.1.)  As part of the contemplated transaction, Dillon would "become[ ] the Executive Director of the FACT program August 1, 2018 and assume[ ] all duties and responsibilities previously performed by Stafford."  (FACT Framework Doc.).  The FACT Framework Document further set forth "bullet points [to] serve as a beginning framework" to meet the parties' objectives, but did not purport to convey any interest in FACT. (FACT Framework Doc.)  Instead, it provided for a series of actions and agreements regarding the sale to be performed or accomplished in the future.  (*See* FACT Framework Doc.)

14.    On July 31, 2018, Stafford sent Dillon the language she planned to send to airline contacts concerning FACT's ownership change: "as of August 1, 2018 I will no longer be in the role of Executive Director of [FACT] at [TAA]. I am selling my share of the program to . . . Dillon, who has been functioning the past 2½ years as my Senior Flight Attendant Instructor." (Ex. 25 July 31 Email Dillon, ECF No. 72.1.)  Stafford sent the proposed language to airline contacts later that day, (Ex. 26 July 31 Email Contacts [hereinafter "July 31 Email Contacts"], ECF No. 72.1), and informed Bame that she was "transferring everything over to [Dillon,]" (Ex. 28 July 31 Email Bame, ECF No. 72.1).  In August 2018, Stafford sent Dillon electronic copies of the manual and all forms used in the FACT program.  (*See* Ex. 31 Aug. 2 Email, ECF No. 72.1; Aug. 24 Email, Ex. 32, ECF No. 72.1.)  Dillon replaced Stafford as Executive Director of FACT in August 2018, during and after which time they continued to negotiate the sale.  (Aff. Dillon ¶ 15.)

15.    On August 15, 2018, Dillon emailed Stafford a letter that she had sent to McCall in which she advised McCall that "in May, [Stafford] offered to sell me her company—FACT.  She expalained [sic] her relationship to me as follows: She owns FACT and contracts to TAA for 1/2 of the profits.  Then you tell me you own half of FACT and I am basically buying her income stream."  (Ex. 36 Aug. 15 Emails [hereinafter "Aug. 15 Emails"], ECF No. 72.1.)  Dillon also told McCall that she had "no intention of severing the ties with you or TAA.  My intention is to continue business as usual, while growing the revenue for both parties."  (Aug. 15 Emails.) Dillon continued, "I would like to buy FACT—the comapny [sic] or the program from

[Stafford] (as it has been presented as both by [Stafford]) and I would like to contract with TAA for a negotiated amount and negotiated duties." (Aug. 15 Emails.) Stafford did not dispute Dillon's assertions to McCall, responding, "Good letter . . . . Let's hope for the best." (Aug. 15 Emails.)

16. On August 16, 2018, McCall sent Dillon and Stafford a proposed purchase and sale contract, stating that he believed he "captured the relevant items from the framework document previously signed." (Ex. 22 FACT Sales Agreement Emails, ECF No. 72.1.) Over the next few months, the parties prepared and discussed several versions of the agreement. (*See* Ex. 37 Aug. 21 Stafford Email & FACT Framework Doc. [hereinafter "Aug. 21 Stafford Email & FACT Framework Doc."], ECF No. 72.1; Ex. 38 Aug. 30 Stafford Email & FACT Framework Doc., ECF No. 72.1; Dep. Stafford 49:8–10.) During this time, Dillon expressed her desire that the contract be solely between her and Stafford without TAA's involvement. (*See* Aug. 21 Stafford Email & FACT Framework Doc. (stating that Stafford "basically just took [TAA] out of [the FACT Framework Document]"); Ex. 39 2018 Text Messages, ECF No. 72.1 (containing Dillon's reminder to "keep TAA out of it" and Stafford's assurance that "[t]he contract won't reference [McCall]").)

17. On November 8, 2018, Dillon and Stafford signed five documents: (i) a purchase and sale agreement ("November 8 Contract" or the "Contract"), (Ex. 40 Agreement [hereinafter "Nov. 8 Contract"], ECF No. 72.1); (ii) a bill of sale for "that interest and ownership [Stafford] has in [FACT], list of past students, contacts for airlines, all used in business" ("Bill of Sale I"), (Ex. 41 Bill Sale [hereinafter "Bill Sale

I'], ECF No. 72.1); (iii) a bill of sale for the training manual copyright ("Bill of Sale II"), (Ex. 42 Bill Sale [hereinafter "Bill Sale II"], ECF No. 72.1); (iv) a promissory note under which Dillon agreed to pay Stafford a total of $10,000 in monthly installments ("Promissory Note"), (Ex. 43 Promissory Note [hereinafter "Promissory Note"], ECF No. 72.1); and (v) a non-compete agreement ("Non-Compete" or "Non-Compete Agreement") providing that Stafford could not provide the same or similar services as FACT anywhere in the United States without Dillon's written consent for a term of five years (Nov. 8, 2018 to Nov. 8, 2023), (Ex. 44 Non-Compete Agreement [hereinafter "Non-Compete"], ECF No. 72.1), (collectively, the "Contract Documents").

18. The November 8 Contract contains several handwritten provisions, initialed by both Dillon and Stafford, including that "Seller and Buyer have agreed on terms to sell *the business* [*FACT*] *and* the assets of the Business, [*FACT*], by the Seller to the Buyer[.]" (Nov. 8 Contract (emphasis added to handwritten language).) The November 8 Contract lists "[t]he assets of the Business to be sold" and includes "Schedule 'A' Assets[,]" goodwill, "[a]ssignment of all rights to contracts for services in the future[,]" and "all trademarks and trade names which are necessary to use or operate the [a]ssets in the ordinary course of business[.]" (Nov. 8 Contract ¶¶ 1, 8.) Under the Contract, Stafford agreed to transfer rights to the items covered by the Bills of Sale upon full payment of $10,000 from Dillon. (Nov. 8 Contract ¶ 10.)

B.    Events After Entering into the Contract Documents

19.    According to Dillon, FACT did not have online payment processing at the time the Contract Documents were executed. (Aff. Dillon ¶ 18.) On January 11, 2019, Dillon met with McCall to discuss setting up an online processing system, a topic they had discussed in August of the previous year. (Aff. Dillon ¶ 18.) Dillon also informed McCall that she wanted to establish a merchant account and a separate business account for FACT. (Aff. Dillon ¶ 18.) McCall told her that he "understood where [she] was coming from and wanted to figure out a plan for [her] to 'handle the books.'" (Aff. Dillon ¶ 18.)

20.    On January 16, 2019, Dillon emailed Bame and McCall and indicated that she was forming an LLC and setting up a bank account to "get everything over to FACT." (Ex. 46 Jan. 16 Email, ECF No. 72.1.)

21.    On January 21, 2019, a FACT student was incorrectly overcharged for the program, something that had occurred on several prior occasions. (Dep. David Bame 118:4–20:4 [hereinafter "Dep. Bame"][4]; Aff. Dillon ¶ 18.) Dillon avers that she informed McCall of the incident and told him that she had set up an online payment processing system for FACT. (Aff. Dillon ¶ 18.)

22.    According to Stafford, she learned at the end of January 2019 that Dillon "had taken TAA Money and had created a bank account outside TAA's control." (Aff. Stafford ¶ 29.) As a result, Stafford refused to accept further payments from Dillon and on February 5, 2019 returned two payments, either one of which would have

---

[4] Excerpts from the deposition of David Bame are located at ECF Nos. 70.8 and 72.1.

constituted Dillon's final payment under the Promissory Note. (Aff. Stafford ¶ 30; Ex. 49 Account Statements [hereinafter "Account Statements"], ECF No. 72.1; Aff. Dillon ¶ 16.)

23. On February 4, 2019, Dillon emailed McCall, stating that she was not trying to "push [him] out[,]" that the payments in the FACT account were for February students, and that "[i]t really doesn't matter which account their money is in, it will be paid to us the same way." (Ex. 47 Feb. 4 Email, ECF No. 72.1.) TAA ended its relationship with Dillon the following day. (Aff. Dillon ¶ 21.)

24. Dillon subsequently formed an LLC on February 8, 2019 to operate FACT, (Ex. 48 Articles Incorporation, ECF No. 72.1), and began operating FACT in Charlotte, North Carolina soon thereafter, (Dep. Bame 215:1–9; Aff. Dillon ¶ 25). According to Dillon, she taught the February FACT class, but only "[t]o prevent damaging the reputation of McCall, TAA, and the FACT program[.]" (Aff. Dillon ¶ 22.)

25. Dillon asserts that she did not receive compensation for her services as Executive Director or for teaching the January and February 2019 classes. (Aff. Dillon ¶ 23.) According to Dillon, Stafford and TAA continue to operate a flight attendant training program in Greensboro, North Carolina using the copyrighted manual and related training materials Dillon contends she purchased from Stafford. (Aff. Dillon ¶ 26.) It appears undisputed that Dillon tendered the $10,000 payment price and that Stafford retained only $5,500 of the funds tendered. (Aff. Stafford ¶ 30; Aff. Dillon ¶ 16; Account Statements.)

## II.

## PROCEDURAL HISTORY

26. Dillon filed her Complaint against Stafford on February 26, 2019. (Compl., ECF No. 3.)

27. On April 4, 2019, TAA moved to intervene, (Mot. Intervene & Br. Supp. Same, ECF No. 6), which the Court allowed on April 24, 2019, (Order Granting Mot. Intervene & Mot. Extension Time, Staying Disc., & Requiring Mediation, ECF No. 13).

28. Stafford filed her Amended Answer and Counterclaims on May 3, 2019. (First Am. Answer & Countercls. [hereinafter "Stafford's Countercls."], ECF No. 15.) Dillon subsequently filed her Amended Complaint on July 11, 2019, which added FACT as a plaintiff and asserted claims against TAA, (Am. Compl., ECF No. 39), and TAA answered on July 22, 2019, (Answer Am. Compl. Countercls. [hereinafter "TAA's Countercls."], ECF No. 43).

29. Through their Amended Complaint, Dillon and FACT assert claims against (i) Stafford for breach of contract, breach of competition/non-solicitation agreement, copyright infringement, and indemnity/attorneys' fees; (ii) TAA for tortious interference with contract, and (iii) both Stafford and TAA for unfair and deceptive trade practices under N.C.G.S. § 75-1.1, conversion, common law unfair competition/business conversion, trademark infringement under 15 U.S.C. § 1125(a), false advertising, and defamation, for which she seeks monetary damages and injunctive relief. (Am. Compl.)

30.     In response, Stafford asserts counterclaims against Dillon and FACT for fraud/constructive fraud, conversion, breach of contract, declaratory judgment/injunction, and misappropriation of copyright and unfair competition, for which she seeks an accounting, attorneys' fees, monetary damages, and injunctive relief.  (Stafford's Countercls.)  TAA asserts counterclaims against Dillon and FACT for false advertising under 15 U.S.C. § 1125, false designation of origin/trademark infringement under 15 U.S.C. § 1125(a), common law unfair competition, breach of fiduciary duty, common law unfair competition/business conversion, conversion, defamation, breach of the FACT Framework Document, unfair and deceptive trade practices under N.C.G.S. § 75-1.1, fraud, and declaratory judgment, for which it likewise seeks monetary damages and injunctive relief.   TAA also asserts a counterclaim against Plaintiffs and a crossclaim against Stafford for voidable transfer of the FACT business.  (TAA's Countercls.)

31.     After the completion of discovery, the parties filed their Motions for Summary Judgment on January 3, 2020.  (ECF Nos. 66, 68, 71.)  Each party seeks the dismissal of most or all claims asserted against that party.[5]  In addition, Plaintiffs seek summary judgment against Stafford and TAA on all of Plaintiffs' claims against them, Stafford seeks summary judgment against Plaintiffs on Stafford's claims for breach of contract, fraud/constructive fraud, and misappropriation of copyright/unfair

---

[5] Although Stafford states in her motion and brief that all of Plaintiffs' claims against her should be dismissed, Stafford does not offer argument concerning Plaintiffs' claims against her for false advertising, defamation, unfair and deceptive trade practices, conversion, and common law unfair competition/business conversion. (*See* Def. Wendy Stafford's Br. Supp. Mot. Summ. J. 34–37.)

competition,[6] and TAA seeks summary judgment only on its counterclaim against Plaintiffs for declaratory judgment and voidable transfer, or alternatively, on Plaintiffs' claims against it for tortious interference with contract and for damages.

32. The Motions have been fully briefed, and the Court heard arguments on the Motions at a hearing held via videoconference on July 9, 2020, at which all parties were represented by counsel.

33. The Motions are now ripe for resolution.

III.

LEGAL STANDARD

34. "Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.'" *Morrell v. Hardin Creek, Inc.*, 371 N.C. 672, 680, 821 S.E.2d 360, 366 (2018) (quoting N.C. R. Civ. P. 56(c)). "[T]he party moving for summary judgment ultimately has the burden of establishing the lack of any triable issue of fact." *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491, 329 S.E.2d 350, 353 (1985).

35. The party moving for summary judgment may satisfy its burden by proving that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, or by showing through

---

[6] Stafford does not seek summary judgment on her claims against Plaintiffs for conversion, declaratory relief, injunctive relief, an accounting, and attorneys' fees. (*See* Def. Wendy Stafford's Br. Supp. Mot. Summ. J. 4.)

discovery that the opposing party cannot produce evidence to support an essential element of [the] claim." *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000) (citations omitted). "If the moving party satisfies its burden of proof, then the burden shifts to the non-moving party to 'set forth specific facts showing that there is a genuine issue for trial.' " *Lowe v. Bradford*, 305 N.C. 366, 369–70, 289 S.E.2d 363, 366 (1982) (emphasis omitted) (quoting N.C. R. Civ. P. 56(e)). A genuine issue is "one which can be maintained by substantial evidence." *Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523, 534, 180 S.E.2d 823, 830 (1971). If the nonmoving party does not satisfy its burden, then "summary judgment, if appropriate, shall be entered against [the nonmovant]." *United Cmty. Bank (Ga.) v. Wolfe*, 369 N.C. 555, 558, 799 S.E.2d 269, 271 (2017) (quoting N.C. R. Civ. P. 56(e)).

36. In determining whether the nonmoving party has satisfied its burden, the Court "asks whether reasonable jurors could find by a preponderance of the evidence that the [nonmovant] is entitled to a verdict[.]" *Sloan v. Miller Bldg. Corp.*, 119 N.C. App. 162, 165–66, 458 S.E.2d 30, 32 (1995) (emphasis and citation omitted). In making this determination, "[t]he evidence must be considered 'in a light most favorable to the non-moving party.' " *McCutchen v. McCutchen*, 360 N.C. 280, 286, 624 S.E.2d 620, 625 (2006) (quoting *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 470, 597 S.E.2d 674, 693 (2004)).

IV.

ANALYSIS

37.    Collectively, the parties seek summary judgment on over thirty claims they have asserted against one another in this litigation.  The Court addresses the parties' competing and overlapping arguments below.

A.    Claims Based on a Particular Party's Ownership of FACT

38.    The parties argue that the undisputed facts of record require one of three disputed conclusions as a matter of law: (i) that, as Dillon contends, Stafford owned FACT and all of its assets as a sole proprietor and contracted with TAA to perform certain services, (ii) that, as TAA contends, TAA owned all of FACT's assets, except for certain copyrights owned by Stafford, or (iii) that, as Stafford (and, in the alternative, TAA) contends, Stafford and TAA owned FACT jointly in a general partnership, excluding Stafford's copyrights.[7]  Based on its review of the evidence of record under the standard of Rule 56, however, the Court concludes that a genuine issue of material fact exists as to the ownership of FACT, thus precluding the entry of summary judgment on the numerous claims that depend upon a determination of FACT's ownership as a matter of law.

39.    The parties' competing claims and contentions concerning FACT's ownership begin with the November 8 Contract, one of the five documents Dillon and

---

[7] A general partnership is "an association of two or more persons to carry on as co-owners a business for profit" in which the partnership has not filed the required documents for legal status as a limited partnership.  N.C.G.S. § 59-36; *cf.* N.C.G.S. § 59-201 (providing for formation of a limited partnership).

Stafford executed in connection with their purchase and sale transaction. That document initially stated in typewritten font that Stafford had agreed to "sell the assets of the Business" for $10,000 and was amended in handwriting at closing to state that Stafford had agreed to sell to Dillon "the business [FACT] and the assets of the Business, [FACT]" for $10,000. (*See* Nov. 8 Contract.) While the Contract reflects Stafford's representation that she owns the FACT assets which she has agreed to convey, there is no representation in the Contract that Stafford owns the entirety of the "Business, [FACT.]" Dillon argues that this document is unambiguous and definitively establishes that Stafford sold all of FACT to Dillon. Dillon also points to the Promissory Note that Dillon executed in favor of Stafford "for payment for purchase of [FACT]" as further evidence that Stafford sold, and Dillon purchased, all of FACT. (Promissory Note.) Dillon argues that consideration of extrinsic evidence is therefore unnecessary and improper. (Pls.' Reply Def. Wendy Stafford's Resp. Pls.' Mot. Summ. J. 11, ECF No. 103.)

40. Stafford also executed Bill of Sale I, however, in connection with the November 8 transaction. That document states that Stafford "transfer[red] and deliver[ed]" to Dillon "that interest and ownership [Stafford] has in [FACT], list of past students, contacts for airlines, all used in business" and includes Stafford's representation that she owns this transferred "[p]roperty." (Bill Sale I.) In addition, Stafford executed Bill of Sale II by which she transferred and delivered to Dillon "that copyright of 'Airline Training Manual.'" (Bill Sale II.) Stafford argues that these documents show that she sold to Dillon only her interest in FACT, not all of FACT,

which she argues she could not do because she owned FACT jointly with TAA. (Stafford's Resp. Dillon's Mot. Summ. J. 2, ECF No. 78.)

41. TAA agrees with Stafford that she could not sell to Dillon what she did not own and offers undisputed evidence showing that, while Stafford owned the copyright in the training manual, (i) Stafford approached TAA with a proposal to start a flight attendant training program, (Dep. Stafford 15:16–18); (ii) McCall created the FACT name, (Aff. Stafford ¶ 13); (iii) FACT forms displayed TAA's logo and sought to limit TAA's liability, (FACT Forms); (iv) TAA and Stafford split profits earned through FACT, (Aff. Stafford ¶ 14 ); (v) Stafford chose not to make FACT an LLC because Stafford and TAA were "partners[,]" (Dep. Stafford, 18:19–23); (vi) TAA and Stafford jointly contracted with third party vendors, (Aff. Stafford ¶ 12); and (vii) TAA and Stafford performed separate duties for FACT, (Aff. Stafford ¶ 10; *see* TAA's Br. Supp. Mot. Summ. J. 3–4, ECF No. 67). Based on this evidence, TAA argues that TAA owned FACT (excluding Stafford's training manual) and, at the very least, owned FACT jointly with Stafford.

42. The Court's legal analysis first focuses on the Contract Documents from November 2018. The Court determines that these documents—in particular, the November 8 Contract, the Promissory Note, and the two Bills of Sale—are ambiguous and potentially inconsistent concerning what Stafford owned and sold to Dillon. *See, e.g.*, *Morrell*, 371 N.C. at 680, 821 S.E.2d at 366 (noting that "whether the language of a contract is ambiguous is a question of law"); *Register v. White*, 358 N.C. 691, 695, 599 S.E.2d 549, 553 (2004) ("An ambiguity exists in a contract when either the

meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations.").

43. While the November 8 Contract and the Promissory Note, standing alone or considered together, would appear to transfer the "Business[ ] [FACT]," suggesting Stafford owned and transferred all of FACT as Dillon contends, the Bills of Sale reasonably permit a different conclusion. First, Bill of Sale I reflects Stafford's transfer of "that interest and ownership [Stafford] has in [FACT]," permitting a reasonable conclusion that her ownership in FACT was less than 100% and that she transferred less than all of FACT to Dillon. (Bill Sale I.) This reading of the parties' language is supported by Bill of Sale II's transfer of Stafford's copyright in her training manual—a copyright all parties agree she owned entirely. In Bill of Sale II, Stafford stated that she transferred "that copyright"—not that she transferred her "interest and ownership" in that copyright, the formulation used in Bill of Sale I. (Bill Sale II.) The parties' choice of language, therefore, supports a reasonable conclusion that the parties used "interest and ownership" to reflect a transfer of less than 100%—and thus, that Stafford did not transfer to Dillon the entirety of FACT.

44. Having thus concluded that the Contract Documents are ambiguous, the Court may consider extrinsic evidence to ascertain the parties' intent. Where, as here, however, "an agreement is ambiguous and the intention of the parties is unclear, . . . interpretation of the contract is for the jury." *Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs., P.C.*, 362 N.C. 269, 273, 658 S.E.2d 918, 921 (2008).

45.     That said, consideration of the extrinsic evidence offered by the parties further establishes that there is a genuine issue of material fact concerning the ownership of FACT and what Stafford could and did sell to Dillon.  For example, Dillon offers evidence that Stafford owned all of FACT, including McCall's December 30, 2016 email to Stafford that FACT "is your company and you are in charge[,]" and "you make all the decisions[,]" (Attachment J Ex. 16 Dec. 20, 2016 Email, ECF No. 70.9), Stafford's written statements to the United States Copyright Office in July 2018 that she was "selling [FACT] and the copyright and trademark[,]" (Attachment B Ex. 6 July 23, 2018 Email, ECF No. 70.2), and Stafford's various statements that she owned all of FACT's assets, (*see, e.g.*, Nov. 8 Contract ¶ 6).

46.     In the same timeframe, however, Stafford sent her July 31, 2018 letter to the airlines, which Dillon approved, stating that Stafford was "selling my share of [FACT] to . . . Dillon," permitting a factfinder to conclude both that Stafford did not own all of FACT and that Dillon knew that Stafford did not own all of FACT.  (July 31 Email Contacts.)  And furthering the factual confusion over FACT ownership are the following documents, each of which suggests that the FACT business was not entirely Stafford's to convey: (i) Dillon's May 21, 2018 Non-Disclosure Agreement with TAA (identifying FACT as a "portion of [TAA]"), (Non-Disclosure Agreement); (ii) the executed FACT Framework Document (referencing both Dillon's desire to "take over [FACT] entirely[,]" Dillon's anticipated payment for Stafford's "interest in FACT," and Stafford's contemplated conveyance to Dillon of "all [Stafford's] interests in FACT (intellectual rights and ongoing business income stream)[,]" (FACT

Framework Doc.); and (iii) the August 2018 draft Bill of Sale and Assignment and Assumption Agreement reflecting Stafford and TAA as 50% owners of FACT, (Ex. 22 Bill Sale & Assignment & Assumption Agreement, ECF No. 72.1.)

47. Based on the foregoing, therefore, the Court concludes that any summary judgment motion requiring the Court to determine FACT's ownership must be denied under Rule 56. These motions include:

    a. TAA's Motion on its counterclaim against Plaintiffs for a declaratory judgment that TAA owns FACT in its entirety;

    b. Plaintiffs' and Stafford's Motions seeking to dismiss each other's breach of contract claim, except to the extent those claims are based on Dillon's alleged breach of Section 8 of the November 8 Contract, because an issue of fact remains as to what Stafford agreed to sell to Dillon, and thus whether any party breached the Contract Documents on which these competing claims are based[8];

    c. Plaintiffs' and TAA's Motions on Plaintiffs' claim for tortious interference with contract[9] because an issue of fact remains concerning

---

[8] The Court's ruling on this claim is limited to Plaintiffs' contention that Stafford breached the November 8 Contract by using the copyrighted manual and assets after the sale to Dillon, (Br. Supp. Pls.' Mot. Summ. J. 25, ECF No. 69), and Stafford's contentions that because Dillon did not purchase all of FACT, Dillon breached the November 8 Contract by exerting 100% ownership and control over FACT, and that Dillon anticipatorily repudiated the November 8 Contract by taking actions to set up a competing business in Charlotte, (Def. Wendy Stafford's Br. Supp. Mot. Summ. J. 23–29). Stafford also contends that Dillon breached Section 8 of the November 8 Contract, which the Court considers *infra*.

[9] Plaintiffs allege that TAA tortiously interfered with the November 8 Contract by inducing Stafford to breach the agreement and work with TAA using the assets Dillon purchased from Stafford. (Br. Supp. Pl.'s Mot. Summ. J. 27–28.)

whether Stafford, by taking actions consistent with holding an ownership interest in FACT, breached a contract obligation to Dillon and whether TAA's conduct, in allegedly inducing that conduct, was in furtherance of TAA's legitimate business interest, *see, e.g.*, *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988) (noting elements of a tortious interference claim include "a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person" and "the defendant . . . acts without justification"); *Sellers v. Morton*, 191 N.C. App. 75, 82, 661 S.E.2d 915, 921 (2008) ("Interference is without justification if a defendant's motive is not reasonably related to the protection of a legitimate business interest." (internal quotation marks omitted))[10];

d. Plaintiffs' Motion on TAA's counterclaim for breach of fiduciary duty because an issue of fact remains concerning whether Dillon was TAA's agent, and by taking actions consistent with holding ownership of FACT, breached a fiduciary duty by using FACT assets for her business;

---

[10] It appears that TAA may seek summary judgment on the separate ground that Stafford's Non-Compete with Dillon is unenforceable as a matter of law. (TAA's Br. Supp. Mot. Summ. J. 11–15.) It further appears, however, that Plaintiffs base their claim on TAA's alleged interference with "Dillon's purchase of the FACT program and the copyright to the [manual,]" (Am. Compl. ¶ 56), not with the Non-Compete, (TAA's Br. Supp. Mot. Summ. J. 11). Nevertheless, to the extent Plaintiffs seek to base their tortious interference claim on TAA's alleged interference with the Non-Compete, the Court agrees with TAA that the claim should be dismissed because, as explained *infra*, the Non-Compete is unenforceable as a matter of law.

e.  Plaintiffs', Stafford's, and TAA's Motions on Plaintiffs' conversion claim against Stafford and TAA, and Plaintiffs' Motion on TAA's and Stafford's conversion claims against Plaintiffs, because the parties' competing conversion claims necessarily depend upon establishing "ownership in the [moving party,]" which requires the determination of disputed material facts, *see, e.g.*, *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012);

f.  Plaintiffs' Motion on their claims for unfair and deceptive trade practices under N.C.G.S. § 75-1.1 and unfair competition/business conversion and TAA's counterclaims for common law unfair competition and unfair and deceptive trade practices under section 75-1.1; TAA's, and Stafford's Motions on Plaintiffs' claim under section 75-1.1; and TAA's Motion on Plaintiffs' claim for unfair competition/business conversion, because each challenged claim is based on the opposing party's conduct as a purported owner of FACT and the determination of FACT's ownership involves disputed material facts which cannot be decided on summary judgment[11]; and

---

[11] "Courts recognize that a claim for common law unfair competition is analyzed the same way as a claim for unfair or deceptive trade practices under [N.C.]G.S. § 75-1.1." *Global Textile All., Inc. v. TDI Worldwide, LLC*, 2018 NCBC LEXIS 159, at *33 (N.C. Super. Ct. Nov. 29, 2018) (citing *BellSouth Corp. v. White Directory Publishers, Inc.*, 42 F. Supp. 2d 598, 615 (M.D.N.C. 1999)). "The key distinction between the claims is that common law unfair competition claims are limited to claims between business competitors, whereas a [section 75-1.1] claim may be maintained by a consumer or a business competitor." *Gateway Mgmt. Servs. v. Carrbridge Berkshire Grp., Inc.*, 2018 NCBC LEXIS 45, at *18 (N.C. Super. Ct. May 9, 2018) (citing *Henderson v. U.S. Fid. & Guar. Co.*, 124 N.C. App. 103, 108, 476 S.E.2d 459, 462 (1996)).

g. Plaintiffs' and Stafford's Motions on Plaintiffs' claim for indemnity and attorney's fees, and Plaintiffs' Motion on Stafford's declaratory judgment counterclaim, because an issue of fact remains concerning what Stafford sold, and what Dillon purchased, under the Contract Documents, which precludes a determination on summary judgment of indemnity and attorneys' fees under the November 8 Contract.

## B. TAA's Motion on TAA's Voidable Transfer Counterclaim

48. TAA seeks summary judgment on its counterclaim for voidable transfer establishing as a matter of law that Stafford's transfer of her interest to Dillon was a voidable transaction under the Uniform Voidable Transactions Act ("UVTA"). While acknowledging that "untangling the true ownership of FACT assets is a difficult proposition," (TAA Reply Supp. Mot. Summ. J. 2, ECF No. 105), TAA argues that even if Stafford owned a transferrable interest in FACT, summary judgment for TAA is proper dismissing Plaintiffs' claims because the undisputed evidence shows that Stafford's purported transfer to Dillon was for less than reasonably equivalent value, after which Stafford's remaining assets were unreasonably small and left her insolvent, all as required for a voidable transfer under sections 39-23.4(a)(2)(a) and 39-23.5 of the UVTA, (TAA's Br. Supp. Mot. Summ. J. 9). Plaintiff contends that the transfer was not voidable because value and consideration were given in exchange for the copyright and the materials. (Br. Supp. Pls.' Mot. Summ. J. 17.) Stafford does not move for summary judgment on this counterclaim.

49. The Court concludes based on its review of the record evidence that issues of fact remain as to the value of the assets Stafford purportedly transferred to Dillon, the amount of Stafford's remaining assets after transfer, and whether Stafford was insolvent after transfer, precluding summary judgment. TAA's Motion on this ground shall therefore be denied.

C. Plaintiffs' and Stafford's Motions on Dillon's Alleged Breach of Section 8 of the November 8 Contract

50. Stafford contends that Dillon breached Section 8 of the November 8 Contract by taking certain actions to discontinue FACT's relationship with TAA in January 2019. (Def. Wendy Stafford's Br. Supp. Mot. Summ. J. 26–27.) Section 8 provides as follows:

> The Assets include all trademark and trade names which are necessary to use or operate the Assets in the ordinary course of business (with Seller's current use of the Assets as a reference); all such trademarks, service marks, logos and trade names are valid, in good standing and free and clear of all liens and encumbrances of any nature whatsoever, and have not been (i) challenged in any way or (ii) involved in any interference claim or proceeding. Use or operation of the Assets in the ordinary course of business (with Seller's current use of the Assets as a reference) will not involve infringement or claimed infringement of any issued or applied for United States, North Carolina, or local trademark, or trade names.

(Nov. 8 Contract ¶ 8.)

51. Stafford contends that the provision's twin reference to the "use or operat[ion] of the Assets in the ordinary course of business (*with [Stafford's] current use of the Assets as a reference*)" required Dillon to maintain FACT's relationship with TAA. (Def. Wendy Stafford's Br. Supp. Mot. Summ. J. 27.) Plaintiffs disagree and argue that the provision is instead "a warranty and promise of good title of the

trademarks" conveyed.  (Pls.' Br. Opp'n Wendy Stafford's Mot. Summ. J. 14, ECF No. 85.)

52.    The Court agrees with Plaintiffs.  Rather than impose an ongoing obligation, the plain and unambiguous language of Section 8 creates instead an express warranty that Stafford had good title to transfer all the trademarks and trade names that were used to operate the FACT program and a promise that if Dillon used those trademarks and trade names in the same way Stafford had, her use would not infringe any issued or applied-for trademarks or trade names anywhere in the United States.  Accordingly, Plaintiffs' Motion shall be granted, Stafford's Motion shall be denied, and Stafford's breach of contract claim premised on Section 8 shall be dismissed.

D.    <u>Plaintiffs' Motion on Plaintiffs' Trademark Infringement Claim and TAA's Trademark Infringement Counterclaim</u>

53.    Plaintiffs assert a trademark infringement claim under 15 U.S.C. § 1125(a) (the "Lanham Act") against TAA and Stafford, arguing that after Stafford sold FACT to Dillon, TAA and Stafford continued to use the FACT name and mark and claim that they were the original FACT program in a manner that was misleading to students.  (Am. Compl. ¶¶ 88–98.)  TAA also asserts a claim of false designation/trademark infringement under 15 U.S.C. § 1125(a) based on Dillon's use of the terms "FACT," "Triad Aviation Academy," and "TAA."  (TAA's Countercls.

¶¶ 70–82.) Plaintiffs move for summary judgment on their claim and for dismissal of TAA's claim. (Br. Supp. Mot. Summ. J. 8, 28.)

54. As an initial matter, the Court notes that, contrary to Plaintiffs' contention, federal trademark claims are not subject to the exclusive jurisdiction of the federal courts. *See* 28 U.S.C. § 1338(a)–(b). Indeed, state and federal courts have concurrent jurisdiction over such claims, including those asserted by the parties here. *See, e.g.*, *Dunlap v. G&L Holding Grp., Inc.*, 381 F.3d 1285, 1292 n.11 (11th Cir. 2004) ("State and federal courts are expressly given concurrent jurisdiction over claims involving infringement of a federally registered trademark."); *Bd. of Regents v. Phx. Int'l Software, Inc.*, 653 F.3d 448, 465 (7th Cir. 2011) ("A party alleging a trademark violation under the [Lanham Act] may litigate in state court if it so chooses."); *Deats v. Joseph Swantak, Inc.*, 619 F. Supp. 973, 977 (N.D.N.Y. 1985) ("The federal courts' jurisdiction in matters of trademark is concurrent with that of the state courts."). Accordingly, Plaintiffs' jurisdictional challenge to TAA's trademark claims is without merit.

55. Moving on, this Court has observed that "[t]rademark infringement occurs under the Lanham Act when the claimant owns a valid trademark and the defending party's use of a similar mark is likely to cause confusion." *HCW Ret. & Fin. Servs., LLC v. HCW Emp. Benefit Servs., LLC*, 2015 NCBC LEXIS 73, at *32 (N.C. Super. Ct. July 14, 2015) (citing 15 U.S.C. § 1125(a)). The factual disputes surrounding the ownership of FACT preclude a determination as a matter of law that either TAA or Dillon owned a valid trademark in "FACT." Accordingly, Plaintiffs' Motion for

judgment on their claim, and Plaintiffs' Motion to the extent it seeks dismissal of TAA's trademark infringement claim based on Dillon's use of "FACT," shall be denied.

56. The Court further concludes that Plaintiffs' Motion for summary judgment on their claim, and for dismissal of TAA's claim, based on Dillon's use of "TAA" and "Triad Aviation Academy" must also be denied, although for different reasons. TAA offers evidence that Dillon intentionally copied "TAA" and "Triad Aviation Academy" on student receipts, Dillon's social media sites, and on reviews left by members of the public. (TAA's Resp. Interrog. Nos. 19–20, ECF No. 77.1); *see also Osem Food Indus. v. Sherwood Foods, Inc.*, 917 F.2d 161, 165 (4th Cir. 1990) ("[F]rom such intentional copying arises a presumption . . . that there is a likelihood of confusion."). Although Plaintiffs argue that the reviewers' use of the marks cannot be imputed to Dillon as a matter of law and further that "any confusion is based on the similarities between all airline training programs," (Br. Supp. Pls.' Mot. Summ. J. 10), the Court concludes that, viewing the evidence in the light most favorable to TAA, a reasonable factfinder could conclude that Plaintiffs used "TAA" and "Triad Aviation Academy" in circumstances that could cause a likelihood of confusion. Plaintiffs' Motion for summary judgment on their claim and for dismissal of TAA's claim based on Plaintiffs' use of "TAA" and "Triad Aviation Academy" shall therefore be denied.

E. Plaintiffs' and TAA's Motions on Plaintiffs' False Advertising Claim and Plaintiffs' Motion on TAA's False Advertising Counterclaim

57. Plaintiffs and TAA also move for summary judgment on Plaintiffs' false advertising claim under the Lanham Act against Stafford and TAA based on their advertisements stating that they were continuing FACT, that Dillon was fired, and

that Dillon's program was operating elsewhere.  (Am. Compl. ¶ 100; *see* Br. Supp. Pls.' Mot. Summ. J. 28; TAA's Br. Supp. Mot. Summ. J. 1.)  Plaintiffs separately move for summary judgment on TAA's false advertising counterclaim against Plaintiffs based on Dillon's advertisement that FACT had expanded to Charlotte and was "The Highest Student Rated Flight Attendant training class in the US."  (TAA's Countercls. ¶ 59; *see* Br. Supp. Pls.' Mot. Summ. J. 8.)

58.    A party asserting a claim for false advertising under the Lanham Act must establish that (i) the defendant made a "false or misleading statement of fact about a product[,]" (ii) the "statement either deceived, or had the capacity to deceive a substantial segment of potential consumers[,]" (iii) "[t]he deception is material, in that it is likely to influence the consumer's purchasing decision[,]" (iv) "[t]he product is in interstate commerce[,]" and (v) the claimant "has been or is likely to be injured as result of the statement at issue."  *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495 (5th Cir. 2000), *cert. denied*, 532 U.S. 920 (2001); *see also* 15 U.S.C. § 1125(a)(1)(B).  A claimant must prove "either that an advertisement is false on its face or that the advertisement is literally true or ambiguous but likely to mislead and confuse consumers."  *Clorox Co. P.R. v. P&G Comm. Co.*, 228 F.3d 24, 33 (1st Cir. 2000).

59.    Although Plaintiffs and TAA separately contend that the undisputed evidence requires judgment in their favor, the Court finds that the evidence of record discloses material facts in conflict, including the ownership of FACT, foreclosing

summary judgment for either side. Accordingly, Plaintiffs' and TAA's Motions concerning each other's false advertising claims shall therefore be denied.

F. <u>Plaintiffs' Motion on TAA's Declaratory Judgment Counterclaim For A Non-Exclusive License</u>

60. TAA's counterclaim for a declaratory judgment seeks a judicial determination that TAA has an ongoing non-exclusive license to use Stafford's copyrighted material under 17 U.S.C. § 205(e). (TAA's Countercls. ¶¶ 147–53; TAA's Resp. Opp'n Mot. Summ. J. 13, ECF No. 77.) That statute provides for the priority of a non-exclusive license over conflicting copyright ownership if it is "evidenced by a written instrument signed by the owner . . . or such owner's duly authorized agent[.]"

61. Plaintiffs move for summary judgment dismissing TAA's claim, contending that TAA has failed to offer evidence of the required written instrument. (Br. Supp. Pls.' Mot. Summ. J. 23.) TAA argues to the contrary, contending that Stafford's unsigned admission in her answer to TAA's counterclaims that "Stafford gave TAA a license to use the copyright" satisfies the statutory standard. (TAA's Resp. Opp'n Mot. Summ. J. 14; *see* Def.'s Answer Intervenors Countercls. ¶ 13, ECF No. 60.)

62. Although an issue of fact exists concerning whether the materials in which Stafford claims a copyright have been transferred to Dillon, the Court concludes that, even assuming Stafford was the copyright owner, Stafford's unsigned litigation admission, made seven months after the alleged transfer, does not constitute an effective "written instrument" as contemplated by 17 U.S.C. § 205(e). *See, e.g., Scott v. Worldstarhiphop, Inc.*, No. 10 Civ. 9538 (PKC)(RLE), 2012 U.S. Dist. LEXIS 64202, at *5 (S.D.N.Y. May 3, 2012) (holding that there is no written instrument when there

is no indication that "the purported nonexclusive license was reduced to writing"). As a result, the Court concludes that Plaintiffs' Motion should be granted and that TAA's declaratory judgment claim on this issue should therefore be dismissed.

G. Plaintiffs' and Stafford's Motions on Plaintiffs' Claim for Breach of Non-Compete Agreement

63. Plaintiffs and Stafford each move for summary judgment on Plaintiffs' claim against Stafford for breach of the Non-Compete. (Br. Supp. Pl.'s Mot. Summ. J. 28; Def. Wendy Stafford's Br. Supp. Mot. Summ. J. 34.) The Non-Compete provides that Stafford shall not:

> [p]rovide the same or similar industry products, services, or engage in any other way represent [sic] any business of a similar nature to [FACT] . . . without written consent. Nor shall [Stafford] solicit any client of [FACT] for the benefit of a third party that is engaged in a similar business to that of [FACT,] [e]ngage in business activity, whether paid or non-paid, with a competitor of the company that provides a similar product or service. Hire, work alongside, or partner with any current employee or contractors, sales staff, or former employees or contractors of [FACT].
>
> This agreement runs from 11/8/2018 to 11/8/2023 and covers the United States.

(Non-Compete.)

64. A covenant not to compete made in connection with the sale of a business will be enforced "(1) if it is reasonably necessary to protect the legitimate interest of the purchaser; (2) if it is reasonable with respect to both time and territory; and (3) if it does not interfere with the interest of the public." *Jewel Box Stores Corp. v. Morrow*, 272 N.C. 659, 662–63, 158 S.E.2d 840, 843 (1968). A non-compete's time and geographic scope are "not independent and unrelated aspects of the restraint"; rather,

"[e]ach must be considered in determining the reasonableness of the other." *Id.* at 665, 158 S.E.2d at 844. In making that determination, our Supreme Court has held that a geographic scope is reasonable "if it encompasses the area served by the business that the covenant protects, or, more specifically, if the protected business had clientele in the area covered by the covenant[.]" *Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 368 N.C. 693, 698, 784 S.E.2d 457, 461 (2016) (citations omitted).

65. The Non-Compete here covers all of the United States and extends for a period of five years. (Non-Compete.) Plaintiffs, however, offer no evidence that FACT conducted business in all areas of the United States; indeed, the most the proffered evidence suggests is that FACT operated in Greensboro, North Carolina. While our courts accord "[g]reater latitude" to enforce "covenants given by the seller in connection with the sale of a business than in covenants ancillary to an employment contract[,]" *Seaboard Indus., Inc. v. Blair*, 10 N.C. App. 323, 333, 178 S.E.2d 781, 787 (1971), the undisputed evidence here shows that the Non-Compete's geographic scope is far broader than necessary to protect Plaintiffs' legitimate business interests, particularly when considered in combination with the Non-Compete's five-year term, and thus is unreasonable as a matter of law. Accordingly, Stafford's Motion shall be granted, Plaintiffs Motion shall be denied, and Plaintiffs' breach of contract claim based on the Non-Compete shall be dismissed.

H.    Plaintiffs' Motion on TAA's Counterclaim for Breach of the FACT Framework Document

66.    Plaintiffs also move for summary judgment on TAA's counterclaim against Plaintiffs for breach of the FACT Framework Document, contending that the FACT Framework Document constituted an unenforceable agreement to agree rather than a valid and enforceable contract.  (Pls.' Reply Intervenor TAA's Resp. Pls.' Mot. Summ. J. 11, ECF No. 104.)

67.    "To constitute a valid contract, the parties must assent to the same thing in the same sense, and their minds must meet as to all the terms." *Boyce v. McMahan*, 285 N.C. 730, 734, 208 S.E.2d 692, 695 (1974) (citation and internal quotation marks omitted).  "If any portion of the proposed terms is not settled, or no mode agreed on by which they may be settled, there is no agreement." *Id.* (citation omitted).  For this reason, agreements to agree are not enforceable. *See, e.g.*, *Northington v. Michelotti*, 121 N.C. App. 180, 184, 464 S.E.2d 711, 714 (1995) ("Where the parties agree to make a document or contract which is to contain any material term that is not already agreed on, no contract has been made; a so-called 'contract to make a contract' is not a contract at all." (citation and internal quotation marks omitted)).

68.    Here, the FACT Framework Document contains on its face a list of "bullet points [to] serve as a beginning framework" for the parties' continued discussions. (FACT Framework Doc.)    Thus, as in *Boyce*, "the writing itself shows its incompleteness by emphasizing its preliminary character."  285 N.C. at 734, 208 S.E.2d at 695.    Moreover, although TAA characterizes the document as "the prototypical agreement to negotiate in good faith[,]" (TAA's Resp. Opp'n Mot. Summ.

J. 12), the document does not contain any obligation to negotiate or to negotiate in good faith, imposes no current and enforceable obligations, and while contemplating the parties' future negotiations and agreement, simply forecasts that the parties "will have developed and executed an agreement" by a specific identified date, (Fact Framework Doc. ¶ 8). Again as in *Boyce*, the document "expresses the desires of the parties but not the agreement of both." 285 N.C. at 734, 208 S.E.2d at 695. As a result, the Court concludes that the FACT Framework Document is not an enforceable contract under North Carolina law. Therefore, Plaintiffs' Motion shall be granted and TAA's breach of contract claim based on that document shall be dismissed.

I.    Plaintiffs' and Stafford's Motions on Plaintiffs' Claim for Copyright Infringement

69.    Plaintiffs and Stafford separately move for summary judgment on Plaintiffs' copyright infringement claim against Stafford, which is based on Stafford's alleged use of the copyright-registered training manual after Stafford's sale of the manual to Dillon. (*See* 2018 Copyright Registration; Am. Compl. ¶¶ 80–87; Br. Supp. Pls.' Mot. Summ. J. 28; Def. Wendy Stafford's Br. Supp. Mot. Summ. J. 36.) The federal courts, however, have exclusive jurisdiction over claims of copyright infringement. 28 U.S.C. § 1338(a) ("No State court shall have jurisdiction over any claim for relief arising under any Act of Congress relating to patents, plant variety protection, or copyrights."). The Court therefore lacks jurisdiction to hear Plaintiffs' copyright infringement claim. As a result, Stafford's Motion shall be granted, Plaintiffs' Motion

shall be denied, and Plaintiffs' copyright infringement claim shall be dismissed without prejudice.

J.  Plaintiffs' and Stafford's Motions on Stafford's Claim for Misappropriation of Copyright/Unfair Competition

70.  Plaintiffs and Stafford separately seek summary judgment on Stafford's claim for misappropriation/unfair competition, which Stafford bases on Dillon's possession and use of Stafford's copyrighted materials.[12] (Br. Supp. Pls.' Mot. Summ. J. 1; Def. Wendy Stafford's Br. Supp. Mot. Summ. J. 33; *see also* Stafford's Countercls. ¶ 97.)  Because this claim seeks relief for alleged misappropriation and use of copyrighted materials and sounds in copyright infringement, the Court concludes that it too falls within the exclusive jurisdiction of the federal courts as provided in 28 U.S.C. § 1338.  As a result, Plaintiffs' Motion shall be granted, Stafford's Motion shall be denied, and Stafford's counterclaim shall be dismissed without prejudice.[13]

K.  Plaintiffs' and TAA's Motions on Plaintiffs' Claim and TAA's Counterclaim for Defamation

71.  Plaintiffs and TAA separately move for summary judgment on Plaintiffs' defamation claim against Stafford and TAA for their alleged "false and defamatory

---

[12] Stafford's misappropriation of copyright claim overlaps with her breach of contract claim to the extent the latter is based on Dillon's alleged use of Stafford's training manual without payment.  The disputed evidence concerning Dillon's use of the training manual and as explained above, the factual dispute over FACT ownership and the terms of sale preclude summary judgment for either party on this aspect of Stafford's claim.

[13] Stafford argues that the decision of the North Carolina Court of Appeals in *Liberty/UA, Inc. v. E. Tape Corp.*, 11 N.C. App. 20, 180 S.E.2d 414 (1971), permits the assertion of her state law claim for unfair competition based in copyright, (Stafford's Resp. Dillon's Mot. Summ. J. 8).  The Court disagrees.  In *Liberty*, the plaintiff did not claim "statutory or common law copyrights in its recordings" and thus "the principal question presented [was] whether the defendants' conduct in appropriating the performances recorded by plaintiff and selling them in competition with plaintiff amount[ed] to unfair competition[.]"  *Id.* at 21, 180

statements about Dillon in an attempt to discredit Dillon in her professional capacity with FAA to potential students and other FACT employees and independent contractors." (Am. Compl. ¶ 107.) Plaintiffs do not address their defamation claim in their Motion or brief and have offered no evidence that supports the allegations in their Complaint. Summary judgment is therefore proper in favor of TAA, and Plaintiffs' defamation claim shall be dismissed.

72. Plaintiffs also move for summary judgment on TAA's defamation claim against Plaintiffs, which asserts that "at least one agent of [FACT] has made false statements concerning TAA's honesty[.]" (TAA's Countercls. ¶ 109; Br. Supp. Pls.' Mot. Summ. J. 19.) To support its claim, TAA points to evidence that Bame, an independent contractor, told a student that "TAA was 'dishonest[,]'" and that Dillon's website falsely stated that FACT had expanded to Charlotte, North Carolina. (TAA's Resp. Opp'n Mot. Summ. J. 12; TAA's Resp. Interrog. No. 20.)

73. TAA's evidence does not create a triable issue of fact. First, North Carolina law is clear that the defamatory statement by Bame, an independent contractor, may not be imputed to Plaintiffs as a matter of law. *See, e.g.*, *Market Am., Inc. v. Christman-Orth*, 135 N.C. App. 143, 152, 520 S.E.2d 570, 577 (1999) (refusing to impute an independent contractor's defamation to the employer because "the rule is well settled in North Carolina that an employer is not vicariously liable for the torts of an independent contractor"). Moreover, Dillon's statement that FACT had moved

S.E.2d at 415. In contrast, Stafford's unfair competition claim here is based on the improper use of copyrighted materials, a claim over which Congress has granted the federal courts exclusive jurisdiction.

to Charlotte is not defamatory as a matter of law because it does not bear on TAA's "reputation, office, trade, business, or means of livelihood." *Beane v. Weiman Co.*, 5 N.C. App. 276, 277, 168 S.E.2d 236, 237 (1969). As a result, Plaintiffs' Motion shall be granted, and TAA's counterclaim for defamation shall be dismissed.

L. Plaintiffs' Motion on TAA's Counterclaim for Fraud

74. TAA's counterclaim for fraud is based on Dillon's allegedly false statements that she "ha[d] no intention of severing the ties with [McCall] or TAA" and that her "intention [was] to continue business as usual, while growing the revenue for both parties" when she had no intention to continue her business relationship with TAA. (TAA's Countercls. ¶¶ 122–29; *see also* Br. Supp. Pl.'s Mot. Summ. J. 13; Aug. 15 Emails.) Plaintiffs move for summary judgment, contending that TAA has failed to offer evidence that Dillon knew her statements were false when made.

75. "As a general rule, a mere promissory representation will not be sufficient to support an action for fraud." *Leftwich v. Gaines*, 134 N.C. App. 502, 508, 521 S.E.2d 717, 723 (1999) (citation omitted). However, a promissory representation may be actionable "when it is made with intent to deceive the promisee, and the promisor, at the time of making it, has no intent to comply." *Id.* (citation omitted).

76. Although Dillon avers that she never had any intention to sever ties with TAA, (Aff. Dillon ¶ 21), TAA points to sufficient evidence of record to permit that inference and thus for its fraud claim to survive dismissal under Rule 56. That evidence includes (i) a June 26, 2018 email in which Dillon instructed Stafford to "[t]ake out TAA" from the purchase and sale agreement, (June 26 Email); (ii) an

August 21, 2018 email in which Dillon stated that she "basically took [TAA] out of [the proposed agreement,]" (Aug. 21 Stafford Email & FACT Framework Doc.), which she sent six days after writing to TAA that she "ha[d] no intention of severing the ties with . . . TAA[,]" (Aug. 15 Emails); (iii) a September 2018 text message in which Dillon advised Stafford "to keep TAA out of [the contract]," (2018 Text Messages); and (iv) Dillon's entry into the Contract Documents with Stafford without notifying TAA. Plaintiffs' Motion shall therefore be denied.

M. <u>Plaintiffs' and Stafford's Motions on Stafford's Counterclaim for Fraud/Constructive Fraud</u>

77. Stafford has asserted counterclaims against Dillon for fraud and constructive fraud, broadly contending that Dillon abused her position of trust and confidence to compete against Stafford using Stafford's copyrighted materials. Plaintiffs and Stafford each move for summary judgment on these claims. (Br. Supp. Pls.' Mot. Summ. J. 12; Def. Wendy Stafford's Br. Supp. Mot. Summ. J. 29.)

78. Stafford argues that she is entitled to judgment on her claim against Dillon for fraud, contending that the undisputed evidence shows that Dillon "concealed from Stafford Dillon's intent to claim she bought all of FACT" and "to take TAA FACT assets and use them in a manner inconsistent with Stafford's use at TAA[.]" (Def. Wendy Stafford's Br. Supp. Mot. Summ. J. 30.) Plaintiffs argue in opposition that Stafford has failed to support her claim with substantial evidence. (Pls.' Br. Opp'n Wendy Stafford's Mot. Summ. J. 20.)

79. As noted above, promissory representations such as those Stafford alleges here require Stafford, as the promisee, to offer evidence that Dillon, as the promisor,

had no intention to comply with her promise at the time the promise was made. *See Leftwich*, 134 N.C. App. at 508, 521 S.E.2d at 723. To support her claim, Stafford points to the evidence cited above reflecting Dillon's intention to purchase Stafford's interest in FACT and Stafford's testimony that "It never crossed my mind that [Dillon] would go off on her own. Never occurred to me," (Dep. Stafford 99:19–23),[14] to show that Dillon did not intend to comply with her August 15, 2018 email statement to McCall, forwarded to Stafford, that Dillon had "no intention of severing ties with [McCall] or TAA[,]" (Def. Wendy Stafford's Br. Supp. Mot. Summ. J. 30–31).

80. The Court finds Stafford's evidence insufficient to survive scrutiny under Rule 56. First, Dillon's August 15, 2018 statement is one of current intention rather than a promise of future action, and Stafford's evidence does not permit a reasonable factfinder to conclude that Dillon's statement was false when made. This is particularly true when the Court considers that Stafford did not include in the Contract Documents any provision that bound Dillon to continue working with TAA.

81. In addition, Stafford's execution of the handwritten amendments to the November 8 Contract and her receipt of multiple emails reflecting Dillon's express intention not to contract with TAA for the purchase of FACT's assets put Stafford on notice that Dillon intended to claim she bought the entirety of FACT from Stafford. On this record, Stafford cannot show that she reasonably relied on any of Dillon's alleged statements to the contrary, a further basis on which her fraud claim must be

---

[14] It does not appear to the Court that this specific testimony is contained in the voluminous evidentiary record presented by the parties. As noted, however, the Court's consideration of this alleged testimony does not salvage Stafford's claim.

dismissed. *See, e.g.*, *Cobb v. Pa. Life Ins. Co.*, 215 N.C. App. 268, 277, 715 S.E.2d 541, 549 (2011) (for fraud claims, "any reliance on alleged false representations must be reasonable"); *see also, e.g.*, *Biesecker v. Biesecker*, 62 N.C. App. 282, 285, 302 S.E.2d 826, 828–29 (1983) (holding that "[a] person signing a written instrument . . . . may [not] predicate an action for fraud on his ignorance of the legal effect of its terms.") (citations omitted)). As a result, Plaintiffs' Motion shall be granted, Stafford's Motion shall be denied, and Stafford's counterclaim for fraud shall be dismissed.

82. Stafford's counterclaim for constructive fraud fares no better. A claim for constructive fraud requires the claimant to establish facts and circumstances "(1) which created [a] relation of trust and confidence, and (2) led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff." *Head v. Gould Killian CPA Grp., P.A.*, 371 N.C. 2, 9, 812 S.E.2d 831, 837 (2018) (quoting *Rhodes v. Jones*, 232 N.C. 547, 549, 61 S.E.2d 725, 726 (1950)).

83. The undisputed evidence here, however, shows that at all times Dillon and Stafford were engaged in arm's length negotiations leading up to their entry into the Contract Documents and were never in a relationship of trust and confidence in which Dillon "figuratively h[eld] all of the cards[,]" *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 613, 659 S.E.2d 442, 451 (2008) (citation omitted), or which otherwise created a duty on which a claim for constructive fraud is properly premised, *see, e.g.*, *Se. Air Charter, Inc. v. Stroud*, 2015 NCBC LEXIS 82, at *16–17 (N.C. Super. Ct. Aug. 17, 2015) ("Absent extraordinary circumstances of special

relationships of trust and confidence leading to dominion and control, employees who are not also officers and directors should not be put to the burden of defending fiduciary duty claims.").[15]  Contrary to Stafford's contention, the Court finds no evidence, aside from impermissible speculation, from which a reasonable jury could conclude that Dillon's ascension to FACT's Executive Directorship, including at a time when Stafford and/or TAA owned FACT, created a relationship of trust and confidence in which Dillon ran roughshod over Stafford.  As a result, Plaintiffs' Motion shall be granted, Stafford's Motion shall be denied, and Stafford's counterclaim for constructive fraud shall be dismissed.

N.    TAA's Motion on Plaintiffs' Damages Claims

84.    TAA seeks dismissal of Plaintiffs' claims for damages, contending that the damages Plaintiffs seek are unduly speculative or subject to offset, or are not the result of TAA's conduct.  (TAA's Br. Supp. Mot. Summ. J. 15.)  Plaintiffs offer evidence and argument in opposition that the Court concludes is sufficient to survive TAA's motion under Rule 56 based on the record evidence at this time.  The Court, however, will permit TAA to advance its same contentions should it wish to do so when the Court considers the parties' motions *in limine* in anticipation of the trial of this action.

---

[15] Although Stafford complains that Dillon knew she was ill and took advantage of her in the transaction, (Def. Wendy Stafford's Br. Supp. Mot. Summ. J. 33), Stafford offers no evidence that would permit a reasonable factfinder to reach this conclusion.  Indeed, Stafford's regular and numerous communications with Dillon during the months leading up to their entry into the Contract Documents in November 2018 do not reveal Stafford's mental or emotional infirmity, and Dillon has not offered any evidence, medical or otherwise, that suggests the contrary.

V.

CONCLUSION

85.     **WHEREFORE**, based on the foregoing, the Motions are hereby **GRANTED in part** and **DISMISSED in part** as follows:

a. Stafford's Motion for summary judgment on Plaintiffs' claim for breach of the Non-Compete Agreement is **GRANTED**, Plaintiffs' Motion is **DENIED**, and that claim is hereby **DISMISSED with prejudice;**

b. Stafford's Motion for summary judgment on Plaintiffs' claim for copyright infringement is **GRANTED**, Plaintiffs' Motion is **DENIED**, and that claim is hereby **DISMISSED without prejudice;**

c. TAA's Motion for summary judgment on Plaintiffs' claim for defamation is **GRANTED**, Plaintiffs Motion is **DENIED**, and that claim is hereby **DISMISSED with prejudice**;

d. Plaintiffs' Motion for summary judgment on TAA's counterclaims for breach of the FACT Framework Document, defamation, and for declaratory judgment based on a purported non-exclusive license are **GRANTED**, TAA's Motion on its counterclaim for declaratory judgment based on a purported non-exclusive license is **DENIED**, and the above-referenced counterclaims are hereby **DISMISSED with prejudice**;

e. Plaintiffs' Motion for summary judgment on Stafford's claims for fraud/constructive fraud, and breach of contract based on Section 8 of

the November 8 Contract, is **GRANTED**, Stafford's Motion is **DENIED**, and those claims are hereby **DISMISSED with prejudice**;

f. Plaintiffs' Motion for summary judgment on Stafford's Claim for Misappropriation of Copyright/Unfair Competition is **GRANTED**, Stafford's Motion is **DENIED**, and that claim is hereby **DISMISSED without prejudice**;

g. Summary judgment is **DENIED** on the Motions seeking entry of judgment or dismissal on the following claims, and those claims shall proceed to trial:

  i. Plaintiffs' claims for breach of contract, indemnity, and attorneys' fees against Stafford, tortious interference with contract against TAA, and unfair and deceptive trade practices, conversion, common law unfair competition and business conversion, trademark infringement, and false advertising against both TAA and Stafford;

  ii. TAA's counterclaims for declaratory judgment to the extent those claims are based on the ownership of FACT, false advertising, false designation/trademark infringement, common law unfair competition, breach of fiduciary duty, common law unfair competition/business conversion, conversion, fraud, and unfair and deceptive trade practices against Plaintiffs, and voidable transfer against Plaintiffs and Stafford; and,

iii. Stafford's counterclaims for conversion, breach of contract based on ownership of FACT, declaratory judgment, injunctive relief, accounting, and attorneys' fees against Plaintiffs.

86. TAA will be permitted to advance its contentions regarding Plaintiffs damages should it wish to do so when the Court considers the parties' motions *in limine* in anticipation of the trial of this action.

87. The Court shall set this matter for trial by separate order after consultation with counsel for the parties, consistent with the Guilford County Jury Trial Resumption Plan as implemented in the North Carolina Business Court.

**SO ORDERED**, this the 30th day of December, 2020.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge